TRISTRAM CLARK, ROYAL WILLIAMS, EBENEZER McLELLAN, THOMAS McLELLAN, AND JAMES R. S. WILLIAMS, CLAIMANTS OF THE BARQUE SUSAN W. LIND, APPELLANTS, *v.* NATHANIEL BARNWELL AND JAMES RAVENEL, COPARTNERS TRADING UNDER THE FIRM OF BARNWELL & RAVENEL.

Where goods are shipped and the usual bill of lading given, "promising to deliver them in good order, the dangers of the seas excepted," and they are found to be damaged, the *onus probandi* is upon the owners of the vessel, to show that the injury was occasioned by one of the excepted causes.

But, although the injury may have been occasioned by one of the excepted causes, yet still the owners of the vessel are responsible if the injury might have been avoided, by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods. But the *onus probandi* then becomes shifted upon the shipper, to show the negligence.

Where spools of cotton thread, put up in boxes, were shipped at Liverpool for Charleston, and the vessel had a voyage of sixty-one days, going far south into a warm climate, and the thread was an article peculiarly subject to the effect of dampness, some of the inside boxes being stained, whilst the outside ones were not the cargo

Clark et al. *v.* Barnwell et al.

also being well stowed and dunnaged, the injury must be attributed to the dangers of the seas.

The usage of trade is to bring sacks of salt in the same vessel with dry goods; and the evidence in this case is that, if the salt be well stowed, it does not increase the humidity of the vessel, but rather acts the other way.

In this case, also, there was no evidence that the shipmaster was guilty of any negligence in omitting to provide proper precautionary measures. He was not responsible for the effect of boisterous weather or adverse winds.

The words " contents unknown" being annexed to a bill of lading, imply that the master only meant to acknowledge the shipment in good order of the cases, as to their external condition. He might justify himself by showing that the contents were not in good order, but the evidence in this case shows that they were so; and the injury must be attributed to the dangers of the seas.

THIS was an appeal from the Circuit Court of the United States for the District of South Carolina.

It was originally a libel, filed in the District Court by Barnwell & Ravenel against the ship Susan W. Lind, under the following circumstances:

On the 4th of March, 1848, Richard Shiel & Co. shipped, at Liverpool, in the ship Susan W. Lind, Tristram Clark, master, twenty-four boxes of cotton thread, consigned to Barnwell & Ravenel at Charleston. The bill of lading contained the usual clause, " to be delivered in like good order, (all and every, the dangers and accidents of the seas and navigation, of whatsoever nature and kind, excepted,") and was signed by Clark, with the remark, " contents unknown."

The vessel sailed from Liverpool on the 14th of March, and arrived at Charleston on the 13th of May.

On his arrival, the captain made a protest, showing that the voyage had been very boisterous, and that the vessel had often shipped large quantities of water.

On the 15th of May, the captain requested the wardens of the port to make the survey of his vessel, and they continued the inspection during the discharging of the cargo. The following is that part of their report which related to the goods in question:

" On the 29th and 31st, the wardens examined twenty-two cases marked C [B R] ‡ 71 & 92. After they were landed and in store, found many of them stained outside with mud, dry, and in good order; on opening the cases, the wood inside in several of the cases appeared stained; inside of these cases were stowed small boxes; on opening them, the cotton thread contained therein was found musty, mouldy, and damaged; which, in our opinion, has been caused by the great humidity, sweat, and dampness of the hold."

Barnwell & Ravenel also had a survey made by Mood and Smith, who reported as follows:

" That we found the whole of the contents of the said twenty-

two cases to be in a damaged and unmerchantable condition; and we concurred in recommending an early sale thereof at public auction, for account of whom it may concern. And we do further certify that, if the said cotton sewing-thread had been landed in a sound and merchantable state, the same would be worth in this market, at the present time, for cash, forty-five dollars per box, containing one hundred dozen spools, say 22 cases, each containing 6 boxes of 100 dozen.

132 boxes *a* $45 per box, . . . . . $5,940

" Witness our hands, at Charleston aforesaid, the thirty-first day of May, in the year 1848.     Wm. G. Mood,
                                                Thos. P. Smith."

The goods were sold at auction, and produced only the net sum of $3,335.09; but the duties being abated by $376.02, the loss was claimed to amount to $2,228.89.

On the 31st of May, 1848, Barnwell & Ravenel filed their libel in the District Court of the United States against the ship, her tackle, apparel, and furniture, and against Clark and all persons who should intervene.

On the 3th of June, 1848, Clark filed a claim for himself, Royal Williams, Ebenezer McLellan, Thomas McLellan, and James R. S. Williams, all of Portland, in Maine; and afterwards an answer was filed, denying all the allegations of the libel.

A considerable amount of evidence was heard, tending to show the value of the articles shipped, the state in which they were landed, the amount of damage sustained and the causes to which it could be attributed.

On the 24th of June, 1848, the district judge dismissed the libel on the ground of there not being introduced at the trial of the cause, sufficient evidence to establish the fact of the goods being in good order and condition at the time of their shipment.

The libellants appealed to the Circuit Court. Additional testimony was taken to show that the goods were shipped in good condition.

On the 8th of May, 1849, the Circuit Court reversed the decree of the District Court, " conclusive evidence having been given to this court which was not produced before the said District Court as to the shipment of the goods at Liverpool in good order and condition," and decreed that the respondents should pay to the libellants the sum of $2,228.89 with costs.

The respondents appealed to this court. It was argued by *Mr. Evans* for the appellants, and *Mr. Coxe* for the appellees.

The whole evidence having been brought up and the argu-

ment consisting chiefly of an examination of the facts proven, it is obvious that only the points made by counsel can be stated. ·

The counsel for the appellants contended,

1. That the injury which the thread was found to have received was not occasioned by any defect or want of seaworthiness of the vessel, or any want of care in the stowage of the cargo, or in navigating the vessel; nor by any neglect, fault, or mismanagement of the master or crew. That salt in sacks is not an unsuitable article to compose a part of the cargo in a general ship. ·

That the injury which the thread appeared to have sustained was not occasioned by the salt which composed a portion of the cargo ; but, if sustained on board, arose from other causes, for which the vessel and owners are not responsible. ·

2. If the injury was occasioned by the dampness of the hold of the vessel necessarily and naturally incident to such a voyage, the vessel and owners are not responsible, it being one of the perils of navigation within the exception of the bill of lading.

The exception is: "All and every the dangers and accidents of the seas and of navigation, of whatever nature and kind."

All vessels are subject to dampness in the hold, and especially vessels laden at Liverpool, which is a damp and wet place. "Liverpool is very damp." "Ships, with or without cargo, are always damp, more or less, especially in summer, on a voyage from Liverpool to Charleston." "The heat of the ocean and other causes do produce dampness," &c.

3. That the thread was insecurely and insufficiently packed for so long and boisterous a voyage as this was. This is manifest from the frequent instances of injuries received by other thread, similarly put up ; from the practice of other manufacturers to pack in tin cases, and from the adoption of that mode by Coates & Co., in consequence of the repeated instances of damages sustained on the voyage by thread packed in wooden boxes.

4. That the proof is insufficient to show that the thread was in good order at the time of shipment. In some of the boxes the spools in the centre were injured, while the layers above and around them were uninjured, which could not have happened if the injury arose from exposure to dampness on board ship.

The bill of lading is not conclusive that the goods were in good order at the time of shipment. ·

"It is obvious that the quality, and frequently also the quantity, of the goods must be unknown to the master, and the

Commentator on the (French) ordinance, (Valin,) informs us, that by the quality, the exterior and apparent quality only is meant," &c.

Abbott on Ship. part 4, ch. 4, sect. 9, also sect. 1; Bates *v.* Todd, 1 Mood. & Rob. 106; Berkley *v.* Watling, 7 Ad. & El. 29. Memorandum at foot of bill lading, — "contents unknown."

The goods in this case were delivered apparently in the same condition as received.

5. The respondents are not liable for the two cases stowed near the salt, the injury to which was of the same kind and degree and arose from the same cause, as existed in regard to the others.

6. That the libellants are not entitled to maintain this process, having no property or interest in the goods, and not being parties to the contract.

" The party really entitled to the relief should always be made the libellant. The practice of instituting a suit in the name of one person, for the benefit of another, to whom the right has been transferred, or of making one person libellant as the representative of many others, does not obtain in the admiralty," &c. Benedict's Admiralty, p. 210, sect. 380.

" The court looks only to rights in the thing itself; to ownership general or special, and to such claims as are direct in the proprietary interest, such as a legal title, a *jus in re ;* or to such as are indirect, as a lien or *jus ad rem.*" Per Story, Ship Packet, 3 Mason, 258.

" If the person to whom delivery is ordered is only an agent of the shipper and has no property in the goods, it has been thought that he cannot maintain an action in his own name against the master for not delivering them; not in assumpsit, for the contract was not made with him, but with a third person, the consignor of the goods ; not in trover, because no property having passed to him, he can have no right to, complain of their non-delivery or conversion, as an injury to himself." Abbott on Ship. part 4, ch. 4, sects. 6, 7.

*Mr. Coxe* for the appellees.

From the abstract of the case, it appears that the decision of the District Court rested entirely upon a defect in the evidence; and of the Circuit Court upon the ground that new and additional testimony had been introduced to cure that defect. If so, the case comes precisely within the language of Lord Chancellor Truro, in the recent case of Stuart *v.* Lloyd, 15 Jurist, 411 ; 4 Eng. Law and Eq. Rep. 3: " Were I called upon in this case to review the judgment of the Lord Chancellor upon matters of fact, I should require a very strong case to be made out to induce

me to overrule that opinion, as I think that the better course is to rest satisfied with the opinion of one judge upon such matters." Such a doctrine promulgated from such high authority needs no comment.

Should the court, however, consider the question as entirely open, or that it involves any question of law of a debatable character, then the appellees submit, —

1. That the *onus probandi* is always on the carrier to exempt himself. Story on Bailm. sect. 529.

The bill of lading, which, on its face, says, " shipped in good order," is, at least so far as regards the exterior appearance, conclusive evidence of the condition of the goods. Benjamin *v.* Sinclair, 1 Bailey's S. C. Rep. 174. The fact of damage being positively established, it devolves upon the carrier to show that it resulted from the only exception to responsibility which the bill of lading recognizes, " the dangers and accidents of the seas and navigation."

It is perhaps unnecessary for us to contend that it is conclusive evidence. It will be sufficient for us to say what can scarcely be denied, that it is *primâ facie* and cogent evidence of what it asserts. It may be impugned for fraud, but I am not aware of any decision which avows it to be questioned upon any other ground. Some *dicta* may be found which put it upon the footing of a receipt for money, and permit it to be explained, or even contradicted, but no such doctrine is established by any judicial decision of which I am aware.

Bates *v.* Todd, 1 Mood. & Rob. 106, is a *nisi prius* decision. It is inaccurately given in Abbott, 324. In the original report it is distinctly stated that fraud proved is a sufficient ground to impeach a solemn deed or even a judgment. Abbott, however, omits to notice this important feature in the case.

Berkley *v.* Watling, 7 Ad. & El. 29, was an action of assumpsit in a common-law court, brought by an assignee of a bill of lading. In p. 35, Patteson J. refers to this circumstance, and asks, Where is the contract between the shipper and the assignee ?

The decision of that case was put on the ground that plaintiff's agent was cognizant of the true state of facts varying from the bill of lading, and that knowledge of the agent is knowledge of the principal.

Whatever weight is to be given to the bill of lading in this particular, the evidence *dehors* is strong, if not, as the Circuit Court considers it, conclusive upon this point.

*Mr. Coxe* then examined the testimony.

2. The evidence furnished by the bill of lading being, in this case, corroborated by the positive testimony of witnesses, it can

scarcely be that any doubt can exist upon the questions of law which grow out of the facts. The carrier can only exonerate himself from the responsibility thus *primâ facie* established, by showing affirmatively his exemption. He must either disprove the evidence upon which he is charged; the character of the goods when shipped; that they were in good condition when delivered; or that the damage which they have suffered is attributable to the act of God, or the public enemy. Abbott on Ship. 420, 467; Story on Bailm. sect. 509; 2 Kent's Com. 602; Forward *v.* Pittard, 1 T. R. 27. Even in a case where any negligence on the part of the carrier is negatived. Siordet *v.* Hall, 4 Bing. 607.

In the case at bar it was, on the other hand, affirmatively shown that there was a quantity of salt shipped on board the vessel, and that such a cargo has a tendency to produce dampness, which is calculated to damage goods of the character of those shipped by libellants. Story on Bailm. sect. 509. For an injury thus resulting, the carrier is, unquestionably, responsible. The cause of the injury is not one of those for which he can claim exemption from responsibility.

3. The thread was insecurely and insufficiently packed, the counsel on the other side contends, for such a long and boisterous voyage as this was.

The voyage was two months, and the ship sustained no damage. No ocean-water was found in her.

But it is said that the libellants, being consignees, have no right to bring this suit. The bill of lading was executed by the master of the ship, and its obligation enured to the benefit of all those who are interested in the goods shipped. In this case the contract is expressly to deliver these goods to the libellants by name, and that undertaking is conditional on the payment of freight at Charleston, the port of delivery. They are thus made, in terms, parties to the contract. So far as regards the simple fact of delivery, the contract was performed; the goods were delivered at Charleston to the libellants. The bill of lading further stipulates that the goods are to be delivered "in like good order and condition." As libellants were entitled to receive the goods, they were entitled to have them delivered in good condition.

The shippers were merely consignees, and never had any other interest or concern in the property. (See their testimony.)

The authorities cited in appellants' brief show that these shippers could not have brought this suit, they having no interest in the property. But these authorities do not admit of the construction given to them. The language of Mr. Justice Story, as cited from 3 Mason, has not the remotest connection with the

doctrine it is invoked to support.   In that case the New England Marine Ins. Co. filed a libel on a bottomry-bond.   This company was an underwriter upon the vessel, and a loss having ensued the ship was abandoned to the underwriter, but the company had refused to accept the abandonment; and in deciding against its right to institute the suit, Judge Story employs the language cited by the counsel.   The correct doctrine is laid down in Abbott, 325, 328, 330, 335.   In 337 it is said the consignee will be deemed to have the property, unless the contrary appears.   That he is the proper party to enforce the obligations of the bill of lading, is most clearly and conclusively shown in 6 Serg. & Rawle, 429.   See particularly the opinion of Tilghman C. J., and Duncan, J.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the District of South Carolina in admiralty.

The libel was filed against the ship Susan W. Lind and owners for alleged damage to cargo shipped to the libellants, as consignees, from Liverpool to Charleston, through the neglect and fault of the master.   The goods shipped were twenty-four boxes of cotton thread, which on delivery at Charleston were damaged to the amount of some fifty per cent.   The spools of thread were packed in small wooden boxes lined with paper, one hundred dozen in each box, and again inclosed in a large wooden box, six small boxes in each large one, lined with paper between the small boxes.   When these boxes were delivered and opened, the spools of thread in each of the small boxes were more or less stained, and spotted by dampness and mould, though the large and small boxes themselves were generally dry, as was also the paper covering the thread.

The respondents in their answer allege, that, if the contents of the boxes were in a damaged state when opened, the damage must have existed, or originated in causes that existed, before they were delivered on board the ship, though not indicated by the external appearance of the boxes; or must have been produced by the effects of the dampness of the atmosphere in the hold of the vessel to which goods, wares, and merchandise are exposed, and, especially such as were shipped for the libellants, in all vessels, however tight and stanch, with cargoes however well stowed, on as long and boisterous a passage as was experienced by the Susan W. Lind ; or, the same was caused by such dampness in consequence of the neglect of the shipper in not having packed the cotton thread in boxes calculated to exclude the damp air which otherwise it must be subject to in the transportation across the Atlantic.

The vessel sailed from Liverpool on the fourteenth day of March, 1848, and arrived at Charleston, her port of destination, on the fourteenth day of May following, making a long voyage of sixty-one days, during which she encountered rough weather and violent gales, causing her to labor heavily, and occasionally ship water.

As we have already stated, the cotton thread, when the boxes were delivered to the consignees and opened, was found damaged on account of stains and spots, the effect apparently of dampness and mould happening in the course of the shipment.

The bill of lading admits that the twenty-four boxes were shipped in good order, and bound the respondents to deliver the same in like good order, " all, and every the dangers and accidents of the seas and navigation of whatsoever nature and kind excepted." And the main question in the case is, whether or not the damage in question was occasioned by one of the perils and accidents within this clause of the bill of lading? For, as the masters and owners, like other common-carriers, may be answerable for the goods, although no actual blame is imputable to them, and unless they bring the case within the exception, in considering whether they are chargeable for a particular loss, the question is, not whether the loss happened by reason of the negligence of the persons employed in the conveyance of the goods, but whether it was occasioned by any of those causes, which, either according to the general rules of law, or the particular stipulations of the parties, afford an excuse for the non-performance of the contract. After the damage to the goods, therefore, has been established, the burden lies upon the respondents to show, that it was occasioned by one of the perils from which they were exempted by the bill of lading, and, even where evidence has been thus given bringing the particular loss or damage within one of the dangers or accidents of the navigation, it is still competent for the shippers to show, that it might have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods; for, then, it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss occasioned by his negligence, and inattention to his duty. Hence it is, that, although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable. But in this stage and posture of the case, the burden is upon the plaintiff to establish the negligence, as the affirmative lies upon him. On this ground in the case of Muddle *v.* Stride, 9 Car. & Payne, 380, which was an action against the proprietors of a steam vessel to recover compensation for damage to goods sent by them as carriers, Lord Chief Justice Denman, in

Clark et al. *v.* Barnwell et al.

summing up to the jury observed, "if on the whole, it be left in doubt what the cause of the injury was, or, if it may as well be attributable to 'perils of the sea' as to negligence, the plaintiff cannot recover; but, if the perils of the seas require that more care should be used in the stowing of the goods (articles of silk and linen) on board, than was bestowed on them, that will be negligence for which the owners of the vessel will be liable. That the jury were to see clearly, that the defendants were guilty of negligence before they could find a verdict against them."

Now, applying these principles to the facts disclosed in the record, we shall be enabled to determine whether or not the respondents in the court below are liable for the damage that happened to the goods in question, as they settle, with great clearness, the rule of responsibility, and, also, on which side the burden of proof lies to charge or exonerate them as common-carriers. And, on looking into these facts, it will be seen, that all the witnesses concur in the conclusion that the damage was occasioned by the humidity of the atmosphere and dampness of the ship's hold, producing mould and mildew upon the cotton spools, and thereby staining and spotting the thread, impairing its strength, and rendering it unmerchantable. The article appears to be peculiarly subject to the effect of humidity and dampness, as the paper with which it was covered in the small boxes was generally dry, and unaffected, when at the same time the thread beneath was mildewed and stained, and what is more remarkable, in many instances the upper layers of the spools were perfectly dry and sound, while those lying in the centre were mouldy and spotted; and in other instances, the only part affected were the layers in the centre.

The vessel was a general ship, tight and stanch, well equipped, and manned; and was laden with a mixed cargo, consisting of cases and crates of dry goods, hardware, and about two thousand sacks of salt. The cargo was well stowed and dunnaged. The sacks of salt when discharged were dry as usual, and in good condition; and no part of the cargo, except the cases in question, appears to have been injured in the voyage, or the subject of any complaint.

It was insisted on the argument, that the respondents were in fault in taking on board their vessel the goods in question with salt as part of the cargo; but, the evidence is full that salt in sacks is part of a mixed cargo of nearly all the vessels engaged in the trade between Liverpool and Charleston. One witness, who has been in the Liverpool trade for ten years, states, that salt is part of the cargo of nine out of ten vessels trading from that port to the United States. Several shipmasters who have been engaged in this trade, state, that salt always constituted a part

24*

of their cargo, and they never knew any damage occasioned to the other goods. Indeed, the evidence is all one way on this point. In consequence of damage occasionally happening to these goods, and others of like character, in vessels of a mixed cargo of which salt was a part, some merchants latterly gave particular directions to their correspondents not to send their goods in a ship of this description. But this only shows that the general usage of the trade would justify the shipment with salt as part of the cargo, and hence the necessity of the particular instructions.

The weight of the evidence also seems to be, that the presence of salt as part of the cargo of the ship does not produce humidity or dampness in the atmosphere; but tends rather to diminish it by attracting and absorbing the humidity; and that unless in contact with the salt, or exposed to the drain from it by bad stowage, no injury would accrue to the other goods.

Some attempt was also made upon the argument to show that the salt was badly stowed, regard being had to the nature and character of the goods in question; and that the damage was properly attributed to this circumstance. But there is no foundation for the argument upon the evidence. The salt was not within thirty feet of the cases of dry goods, with the exception of two cases, which were well dunnaged with matting and an inch board between them and the salt. The spools of thread in these were not damaged more than in the rest of the boxes.

Now the evidence showing very satisfactorily that the damage to the goods was occasioned by the effect of the humidity and dampness, which in the absence of any defect in the ship, or navigation of the same, or in the stowage, is one of the dangers and accidents of the seas for which the carrier is not liable, the burden lay upon the libellants to show, that it might notwithstanding have been prevented by reasonable skill and diligence of those employed in the conveyance of the goods. For, it has been held, if the damage has proceeded from an intrinsic principle of decay naturally inherent in the commodity itself, whether active in every situation, or only in the confinement and closeness of the ship, the merchant must bear the loss as well as pay the freight; as the master and owners are in no fault, nor does their contract contain any insurance or warranty against such an event. 12 East, 381; 4 Campb. 119; 6 Taunt. 65; Abbott on Ship. 428, (Shee's Ed.) But if it can be shown that it might have been avoided by the use of proper precautionary measures, and that the usual and customary methods for this purpose have been neglected, they may still be held liable. And the same rule applies in the case of damage on account of the humidity and

dampness of the ship, which is, more or less, incident to all vessels engaged in trade and navigation, especially upon the high seas. Notwithstanding, therefore, the proof was clear, that the damage was occasioned by the effect of the humidity and dampness of the vessel, which is one of the dangers of navigation, it was competent for the libellants to show, that the respondents might have prevented it by proper skill and diligence in the discharge of their duties; but no such evidence is found in the record. For aught that appears every precaution was taken that is usual or customary, or known to shipmasters, to avoid the damage in question. And hence we are obliged to conclude that it is to be attributed exclusively to the dampness of the atmosphere of the vessel, without negligence or fault on the part of the master or owners.

No doubt the unusual duration of the voyage, on account of tempestuous weather and adverse winds, in connection with the fact that it was one in which the ship passed from a northern to a southern latitude, and in a season of the year when the change from a cold to a warm climate must have been considerable, greatly increased the dampness, and also the influence of it upon goods liable to damage from that cause.

But the carrier is not responsible for delay in the voyage on account of boisterous weather or adverse winds, low tides, or the like, as was held in the case of Boyle *v.* M'Laughlin, 4 Harr. & J. 291. These are dangers and accidents of the navigation over which he has no control, and against which his contract contains no warranty.

Another point was made on the part of the respondents below, which it may be proper briefly to notice. It was insisted that these goods had not been packed in good condition in the boxes at Paisley by the manufacturer, or if otherwise, that the damage might have happened to them in the conveyance from that place to Liverpool, before they were shipped for Charleston.

The bill of lading contained the usual clause, that they were shipped in good order; but there was added, at the conclusion, "contents unknown."

It is obvious, therefore, that the acknowledgment of the master as to the condition of the goods when received on board, extended only to the external condition of the cases, excluding any implication as to the quantity or quality of the article, condition of it at the time received on board, or whether properly packed or not in the boxes. Abbott, 339, (Shee's Ed.) p. 216, (Story's Ed.) And if the evidence on the part of the defence laid a foundation for a reasonable inference, that the damage resulted from an imperfection in the goods when packed in the cases, or had occurred previously to their being shipped on board,

the burden was thrown upon the libellants to rebut the inference. It was accordingly assumed in this case, and evidence produced as to the condition of the thread when packed at Paisley, and also in respect to the mode of conveyance from that place to Liverpool, preparatory to the shipment. The explanation is as full perhaps as could be well furnished, or as is usual, under the circumstances, and brings the case down, we think, to the question of damage occasioned by the effect of the humidity and dampness of the vessel in the course of the voyage. We have already expressed our views upon that question, the result of which is that the decree must be reversed.

Mr. Chief-Justice TANEY and Mr. Justice WAYNE dissented.

*Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of South Carolina, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court for further proceedings to be had therein, in conformity to the opinion of this court.