Ranney, J.
That the plaintiffs in error were common carriers, and as such undertook to transport the goods of the defendants from Pittsburg to Zanesville, and that they were never delivered at the port of destination, are facts, not only sufficiently averred in the declaration, but were substantially admitted upon the trial. The bill of lading certified, that the goods were received in good order, on board the steamboat Dan Convers, and bound the carriers to deliver them without delay, in like good order, “ the dangers of river navigation, fire, and unavoidable accidents excepted.” The declaration averred, that they were not prevented from making the delivery by any of the excepted perils ; but that the goods were lost by the careless navigation of the boat, by which she was snagged and sunk, at the foot of Brunot's island, in the Ohio river. Upon this averment the parties were at issue — the plaintiffs in error claiming that the loss was occasioned by one of the excepted dangers of the navigation; and they now insist that the court below erred in casting upon them the burden of proving that the accident happened without their fault, while the boat was being navigated with the highest degree of care; and in rejecting certain evidence offered by them.
*1. The question presented upon the first point, arises upon the charge, in which the jury were instructed, that it was incumbent upon the carriers, not only to show that the loss was occasioned by one of the excepted perils mentioned in the bill of lading, but that the proper degree of care was exercised to prevent the loss ; and after stating the three degrees of care required of bailees, under different circumstances, that the carriers were bound to the exercise of the highest of these degrees of care, and responsible for the slightest of the three corresponding degrees of negligence. Counsel for the plaintiffs in error admit, that it was incumbent upon them to have shown that the goods were lost by one of the excepted perils; but they insist that the burden of proof was then shifted upon the owners, and that they were bound to prove negligence before the carriers could be charged. "We think this dividing a thing in its nature indivisible. Either the loss was occasioned by a peril of the navigation, or by the negligence of those in charge of the boat. It must have been the one or the. other, *375 and could not have been both. If proper care could have avoided it, it was not a peril incident to the navigation ; if such care could not, it was. From the very nature of the undertaking, without care, the loss was inevitable; and with care, it might be unavoidable. From the failure to deliver the goods, the law raised the presumption of negligence against the carriers — prima facie, the fault was theirs — and this presumption could only be rebutted by showing that they wore without fault. As positive care was indispensable to the safety of the goods, they could meet and overthrow the legal presumption of negligence, in no other way than by showing that such care was exercised. Proof that the boat was snagged, fell short of proving that it was not snagged by the fault of those in charge of it; and, consequently, short of overcoming the prima facie case of the plaintiffs below. To do this it was not enough to have shown, that the loss was occasioned by what might, or might not, have been a danger of the navigation: nothing short of proof that it was the *one, and not the other, could have been sufficient; as nothing short of that could bring the case within the exception provided for in the contract.
The defense rested wholly upon this exception. No attempt was made to bring the case within either of the common-law exceptions to the carrier’s liability.
In the case of Davidson v. Graham, 2 Ohio St. 131, it was settled by this court, that the carrier might, in this manner, limit his common-law liability. But in adopting so important a principle, the court very carefully considered all its bearings; and endeavored to incorporate it into the law of this state, with such qualifications and restrictions, as seemed to be necessary to make it safe and practicable.
Yery strong arguments (thought to be unanswerable by several eminent judges in our sister states) were advanced against any relaxation of the common-law responsibility. It was said, that the highest considerations of public policy required the carrier to become an insurer of the goods intrusted to him,' against everything but the act of God, or the public enemies. That he took upon himself a public employment; and ought not to be permitted to discharge himself from the responsibilities, which the trying test of time and experience had demonstrated to be necessary for the safety of 'the public. That since the introduction of steamboats and railroads, he had, practically, taken exclusive possession of the public *376 ■thoroughfares of the country; and was thus enabled to impose his own terms upon the owners of goods, who had no choice but to employ him. That the owner seldom accompanied his property, and in case of loss or injury, however gross the negligence might have been, was wholly unable to prove it, without relying upon the servants of the carrier, who would always be found too ready to exculpate themselves, and their employer.
, That these considerations were entitled to much weight, can not be doubted; and they were not, to any extent, lost sight of in. •^determining that the parties might by their agreement, to a ■certain extent, restrict the liability of the carrier. He is still regarded as exercising a public employment, and incapable, by any •act of his own, of limiting or evading, the responsibility which the law ■.attaches to its exercise.
The first attempt to do so, by general notices brought home to the owner of the goods, was, for a considerable time, sustained by the English courts — with the frequent expression of regret, however, by distinguished judges, that it had ever been so held — until, <at length, the evil was remedied by an act of Parliament. The ■courts of this country very generally repudiated the doctrine, and. escaped the regrets of the English courts. Hollister v. Nowlan, 19 Wend. 235; Cole v. Goodwin, Ib. 251; Wells v. The Steam Nav. Co., 2 Com. 204; New Jersey Steam Nav. Co. v. The Merchants’ Bank, 6 How. U. S. 344; Jones v. Voorhees, 10 Ohio, 145.
The implied assent of the owner of the goods to the terms pre■scribed by the carrier, upon which the English eases are founded, it is very conclusively shown in the American cases, can not be fairly .assumed; since the carrier is bound to receive and transport alL •goods offered for the purpose, subject to all the responsibilities incident to his employment; and the owner may be quite as fairly presumed to have intended to insist upon the rights he undeniably had, as to have assented to a qualification which the carrier had no right ■to impose.
But a very different question was presented, when cases arose in. •which the owner had expressly assented to such qualification, and made it a part of the contract of transportation.
In such cases, the very obvious conclusion was reached that such ■■a stipulation was valid when it only affected the rights and interests of the owner of the goods. So much of the responsibility of the-carrier as was designed alone for his security, might at his pleasure *377, 378 be renounced, in accordance with the settled maxim of the law— Quilibet potest renunciare juri pro se introducto.
*The limit to this power was equally obvious. The common-law exception to the carrier’s liability of losses arising from the act of God, was well settled, to include only those inevitable-causes of loss into which no human agency could have entered. This left the carrier liable as an insurer for many losses, equally inevitable, and which no care or prudence on his part could have-prevented. No one but the owner of the goods could have any interest in this liability, and as its renunciation had no tendency to-relax the vigilance which the carrier owed to others, the owner was-at liberty to surrender it. But he had no power to stipulate for what was immoral in its tendency, or to take from the carrier any of the motives to the faithful discharge of his public duty, and consequently could not relieve him from the consequences of his own negligence or carelessness.
There is nothing in which the public have a deeper interest than the careful and prudent management of public conveyances, and no higher mtiral obligation than rests upon those intrusted with the control of dangerous forces, to discharge their duties with care and skill. Upon it the safety of thousands of lives and millions of qmoperty daily depends.
Now, one of the strongest motives for the faithful performance of these duties, is found in the pecuniary responsibility which the carrier incurs for the failure. It induces him to furnish safe and suitable equipments, and to employ careful and competent agents. A contract, therefore, with one to relieve him from any part of this responsibility, reaches beyond the person with whom he contracts, and affects all who place their persons or property in his custody. It is immoral, becauses it diminishes the motives for the performance of a high moral duty; and it is against public policy, because it takes from the public a part of the security they would otherwise have.
Nor did the establishment of the principle that the carrier might, by contract, restrict his common-law liability, in any manner, or to any extent, change the rules of evidence before ^applicable to the subject. Before, the law prima facie imposed upon him the obligation of safety, and he was charged upon proof of the nondelivery of the goods. The burden of proof was upon him to bring the case within one of the excepted perils. Ang. on Carriers, sec. 202; Story on Bailm., sec. 529. And it was not brought within the *379 exception, -until it was shown that care and skill could not have-prevented the loss. 2 Green. Ev., sec. 219. We know not where-this rule of evidence has been doubted, except in a divided opinion-of the Supreme Court of the United States, in the case of Clark v. Barnwell, 12 How. 272. The learned judge who delivered the-opinion of the majority was able to bring to his support only the single nisi prius case of Muddle v. Strider, 9 Carr. and Payne, 380, in which Lord Denman instructed the jury that, in passing upon all the evidence before them, they must be able to see clearly that-the carriers were guilty of negligence, before a verdict was found against them.
Judge Nelson very properly admits, that it was incumbent upon-the carriers to have shown a loss from some one of the causes which, by the general rules of law, or the particular stipulations of the-parties, would have furnished an excuse for the non-performance of the contract; and that if reasonable skill and attention could have avoided it, “it is not deemed to be, in the sense of the law, such a-loss as will exempt the carrier from liability, but rather a loss-occasioned by his negligence and inattention to his duty.” But he fails to show how, in the nature of things, where constant care was indispensable, the loss could be shown to have been inevitable, without giving prima facie proof that such care was exercised; or what-reason, founded in public policy or intrinsic justice, could be given for relieving the carrier, within whose knowledge the facts so-peculiarly lay, and by whose agents they could be so easily established, from the necessity of making such proof, and casting the burden of proving the contrary upon the owner of the goods, in most cases ignorant of the facts, and without the means of making' them appear.
*On the whole, we think Mr. Greenleaf fully justified upon principle, and the decided weight of authority, in saying that, “ in all cases of loss by a common carrier, the burden of proof is on him to show that the loss was occasioned by the act of God, or by public enemies. And if the acceptance of the goods was special, the-burden of proof is still on the carrier to show, not only that the cause of the loss was within the terms of the exception, but also that' there was, on his part, no negligence or want of due care.” 2 Green! Ev., sec. 219.
We have alluded, somewhat at length, to the effect of the decision, in Davidson v. Graham, not because all the questions now discussed5. *380 were not fully considered by the court and explicitly siated, but because some of them were not so directly involved as in the pres<ent case, and from a desire to be as explicit as possible upon a subject so highly important to a state whose surplus productions must all find a market through the intervention of common carriers.
The whole may be summed up in this: the carrier, by agreement with the owner, may exonerate himself from responsibility for losses arising from causes over which he has no control, and to which his own fault or negligence has in no way contributed. But in doing so he does not cease to be a common carrier, nor in any manner change his relation to the public as such; and he can only excuse .himself for a failure to deliver the goods intrusted to him, by showing that, without his fault, he has been prevented by some one of the ■causes recognized by law, or specifically provided for in the contract.
This case requires very little to be added as to the degree of care -exacted of the common carrier. We have already said that he is not at liberty to stipulate for any degree of negligence, and that a .loss from negligence can not be within the stipulated exceptions to his liability. Indeed, in the carriage of passengers, and perhaps of goods, by steam, it might not be difficult to place it upon much higher grounds, and to fully justify the remarks of *Mr. Justice Grier, in delivering the opinion of the court in the case of Philadelphia and Reading Railroad Company v. Derby, 14 How. 468. He says: “ Where carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and .safety require that they be hold to the greatest possible care and diligence. And whether the consideration for such transportation •be pecuniary or otherwise, the personal safety of the passengers ■should not be left to the sport of chance, or the negligence of careless agents. Any negligence, in such cases, may well deserve the -epithet of gross.”
But it is only necessary now to say, that if the loss was occasioned by negligence, whether slight or gross, it was not within what was, or could have been made by contract, an exception to the -carrier’s liability.
We are therefore unanimous in the opinion that the district court was right in holding that the burden of proof was upon the carriers to show that there was no negligence or want of care, and that, if the loss was the result of any negligence on their part, it was not within any exception provided for in the contract.
*381 2. The court are not unanimous upon the second question presented. A majority, however, concur in holding that no error was committed. From the bill of exceptions it appears that the principal controversy in the case related to the conduct of the pilot at the wheel, at the time the accident happened. The defendants below gave evidence to show the situation of the boat, the surrounding circumstances, what the conduct of the pilot was, and the head of steam under which he was running; and then called several experienced pilots, who expressed the opinion that the conduct of the pilot in charge of the boat was correct and proper. The plaintiffs-then introduced several pilots, who expressed a different opinion, and thought the pilot in charge should have stopped the engine. The defendants then proposed to recall their witnesses, and also some other pilots who had not been examined, and to prove by them that, in their opinion, it was not *the duty of the pilot to have stopped the engine. This evidence being objected to, was ruled out.
It will be observed, that all these witnesses were giving opinions upon exactly the same circumstances. No attempt was made to-change or vary them in the least. Under the circumstances, the defendants’ witnesses were of opinion that the pilot was right in keeping on steam, and doing just as he did do. With a view to the same circumstances, the plaintiffs’ witnesses were of a different opinion, and thought he should have shut the steam off. Now, what could have been accomplished by recalling the defendants’ witnesses, other than a repetition of the opinion previously expressed, we are quite unable to see. It is true, they might have said, expressly, that the pilot should not have stopped the engine (a question they had not before been asked), but, in the end, it would amount to nothing more than an opinion, that he should have done as he did, and not differently. There can be no dispute as to the general rule of evidence. The party upon whom the affirmation of an issue-devolves, is bound to give all his evidence in support of the issue,, in the first instance; and he can only give such evidence, in reply, as tends to answer the new matter introduced by his adversary. In this ease no new matter was introduced. The opinions of the defendants’ witnesses were simply encountered by those of the plaintiffs’. But while this is the rule, and generally to be adhered to, I am very far from saying that, in the exercise of a sound discretion, it is never to be relaxed. Indeed, very few cases can arise in which *382 .a court would be justified in closing the case, until all tbe evidence ■offered in good faith, and necessary to the ends of justice, has been her.rd. And it is very probable, in this case, that a fuller examination should have been allowed. But this must always be an appeal to the sound discretion of the court, to be determined with a view to all the circumstances, and however determined, is not reviewable ■ on error. It is our duty to see that the rules of law are not infringed, but we can not revise the mere discretion of an inferior tribunal.