## THE GEORGE HEATON. (Two Cases.)

### (*District Court, D. Maryland.* May 15, 1884.)

STOWAGE—DAMAGE TO CARGO.
>    The claimants of the ship having proved a succession of severe storms, and having proved that the cargo was stowed with customary care and skill by experienced stevedores, *held*, on the evidence, that the libelants had not supported the *onus* of showing affirmatively that by proper attention to the stowing the damage to the cargo might have been avoided.

In Admiralty.

*Cowen & Cross*, for libelants.

*Stirling & Thomas*, for respondents.

MORRIS, J. This is a question of responsibility for a very considerable damage to a cargo of steel-wire rods, which the libelants seek to charge upon the steam-ship George Heaton, on account of alleged negligent stowage, and which the claimants of the steamer allege was solely caused by the force of the storms which the ship encountered on the voyage, and which they contend caused the damage, notwithstanding the goods were stowed in a careful and proper manner. The fact that the goods were damaged during the voyage is established, and the burden is upon the claimants of the steamer, in order to exculpate themselves, to prove the defense they have set up. The ship took the steel-wire rods on board in good condition (except some fresh-water rust) at Rotterdam, and sailed thence, as was the understanding, for Newcastle-on-the-Tyne, where she took on the balance of her cargo, and sailed thence to Baltimore, to which port the wire rods were consigned. The cargo consisted in all of 700 tons pig-iron, 221 tons of soda crystal and soda-ash, 33 tons of bags, about 4½ tons of sheep-wash, and 1,025 tons of steel-wire rods, in coils. The steel-wire rods

of libelants, which received the principal damage, were stowed in the hold, in the forward part of the ship, under hatches Nos. 1 and 2. There were 290 tons of wire in No. 1 lower hold, 340 tons in No. 2 lower hold, and there were besides, under hatches 3 and 4, 120 tons stowed between-decks, and 275 tons in Nos. 3 and 4 lower hold. On top of the wire in Nos. 1 and 2 lower holds there were placed deal boards, and on them was put a large quantity of pig-iron. In the forward between-decks there were placed 220 tons of soda-ash in casks, and forward of No. 1 hatch were 20 oil barrels filled with sheep-wash. These 20 barrels of sheep-wash were placed apart from other cargo, 10 barrels being put on each side of a stationary iron partition running fore and aft, in the middle of the ship, from No. 1 hatch to the forecastle bulk-head. During the voyage 10 of these barrels of sheep-wash, all on one side, were broken up; and also about 20 of the casks of soda-ash in the between-decks, next aft of the sheep-wash, broke loose and were destroyed. These packages, breaking adrift, broke down the two ventilators and a sounding pipe which ran through this compartment into the hold, and the liquid mass of sheep-wash, mixed with soda-ash, streamed down through the ventilator holes, and through the crevices of Nos. 1 and 2 hatches, to the pig-iron beneath, and thence found its way down to the coils of steel-wire rods which were under the pig-iron. The sheep-wash, being an alkaline mixture, together with the soda-ash, greatly corroded the libelant's steel wire, and caused a most serious loss to them.

The respondents, to show that the storms encountered by the ship caused the damage, have produced the ship's log, and the testimony of the ship's officers. From the log it appears that the vessel left Newcastle-on-the-Tyne, November 18, 1882, and, proceeding on her voyage by way of the north of Scotland and Pentland Firth, had variable weather until Friday, the 24th, which commenced with stormy winds and sea, with ship rolling heavily, and taking very heavy water on deck. Then the entries are:

"At noon, strong gale and high sea; ship making very heavy weather. At 2 P. M., strong gale and high sea; ship taking dreadful heavy seas over all, filling the decks fore and aft, and splitting tarpaulin on No. 2 hatch; 8 P. M., terrific gale and high sea, attended with dreadful heavy hail squalls; ship rolling heavily, and shipping heavy seas over all; at midnight, heavy gale and high sea; heard the cargo adrift in the holds; impossible to take off the hatches to secure the same; brought ship's head to the sea and wind. Saturday, November 25th, at 1 A. M., took very heavy sea over all, moving life-boats and filling the decks full, fore and aft; engine going dead slow; 2 A. M., terrific gale; cargo rolling heavily in the hold; 4 A. M., ship making dreadful weather; 8 A. M., improving weather; kept ship her course; at 2 P. M., took hatches off and found several casks stove and broke; crew employed securing cargo, and trimming ship upright, having a strong list to port."

The weather was then moderate until Monday, November 27th, when a strong gale set in, with high sea, the ship taking large bodies of water on deck. "At 8 P. M. sudden change of wind, high cross-sea,

ship rolling dreadfully; heard cargo adrift in the hold; impossible to take off the hatches; shipped very heavy sea forward, and sorely injured one man." There was another gale of a few hours on the 28th, but the remainder of the voyage was without incident. With regard to the severity of the storm, the captain testifies that it was as heavy weather as he had ever had on any passage, and that no reasonable precaution in stowage could have prevented the injury.

The first officer testifies that after the first storm, on the 24th, he found several casks of the soda-ash in Nos. 1 and 2 hold had started adrift and broken up, and one of the stringers or wood planks against the sides of the ship had broken; and that after the second storm he found four or five casks of soda-ash and 10 of the barrels of sheepwash broken up, and all the ventilator pipes knocked away in Nos. 1 and 2 between-decks, and also one or two casks of soda-ash broken up in the after-part of the ship; and he gives it as his opinion that such was the weather and the straining of the ship that the cargo would have started no matter how well secured. He states that the soda-ash was placed fore and aft, in single tiers, except four or five casks which were placed athwart ship, on the hatches between-decks. This officer overlooked the stowing of the cargo, and declares that proper dunnage was used, and that it was well stowed. The second officer also testifies to the extreme severity of the storms. All the cargo was stowed under the superintendence of an experienced stevedore named Chunside, and his subordinates were all men of very great experience in stowing and securing similar cargoes for Atlantic voyages. The testimony of the stevedores gives in detail the means adopted by them to secure the cargo, and they all swear it was carefully stowed in the manner which experience had proved was sufficient and proper. There is also the testimony of a number of expert stevedores, who prove that the methods adopted for securing and the manner of placing the cargo were those approved and adopted by all stevedores on the Tyne, and those which experience has proved to be sufficient. Of course, all this testimony of the officers and stevedores is to be received with caution, as they are all of them, in a measure, justifying their own acts after a loss has occurred, alleged to have been caused by their want of skill and care; but still, it is the only testimony which the claimants of the ship could, in any similar case, produce, and must have its proper weight.

There was scarcely any means of judging of the stowage when the vessel arrived. The cargo was then in disorder, and there had obviously been attempts to restow it on the voyage, and it was almost impossible to say whether or not it had been properly secured at the first. One of the libelants' witnesses, an experienced and careful marine surveyor, and formerly a master mariner, gave it as his decided opinion, that, from the small amount of wood which was on the decks, he was satisfied there had not been sufficient dunnage used. This would be an opinion of some weight if there were proven facts

to support it; but, except the fact that the goods were injured, and that the amount of wood appeared to this witness insufficient for dunnage, there is nothing derived from observation of the cargo on its arrival which directly supports the charge that the cargo was not sufficiently secured, and an inference drawn from such insufficient *data* would, of itself, hardly rebut the presumption that experienced stevedores had done their duty.

It is urged that much weight is not to be given to testimony with regard to the severity of the gales, because, after all, the steamer made an average voyage, being 17 to 18 days from Newcastle to Baltimore, and suffered no damage herself. But it is to be considered that the ship was a new iron steamer,—only a few months launched,—225 feet long, 1,428 tons English measurement, 37 feet beam, and 24 feet 6 inches depth of hold; and certainly such a steamer might be expected to ride out almost any storm without sustaining injury. It is true, on such a northerly passage in November and December severe weather may be expected as one of the probable incidents of a voyage, and more care is to be used in stowing cargo than on smoother seas, but it does not seem to me that because the storm, although of great severity, cannot be said to be extraordinary, in the sense that it is out of the ordinary course of nature and but seldom occurs, we are to hold that it is no excuse for the shifting of a cargo. It cannot be predicated, with any reasonable certainty, just what character of straining a cargo, stowed in the customary and proper manner, will withstand. As is the case with seaworthy wooden vessels, which sometimes spring a leak in a rough cross-sea when they have stood the strain of most violent gales, I think it may be quite possible that one cargo stowed with all reasonable and customary caution may get adrift, when another, stowed with like precaution, will come safely through the stress of the same storm. All that can be demanded of the ship-owner is reasonable and customary skill, and where it is shown that the injury was sustained during a severe stress of weather, and was the result of it, and there is also affirmative proof of the proper care in stowage, the shipper must sustain the *onus* of showing, by affirmative proof, that, by proper attention, the damage might have been avoided. *The Titania,* 19 FED. REP. 101.

The quotation from Lord Chief Justice DENMAN's charge in *Muddle* v. *Stride,* 9 Car. & P. 380, given with approval in *Clark* v. *Barnwell,* 12 How. 281, is quite applicable to this case:

"If, on the whole, it be left in doubt what the cause of the injury was, or if it may as well be attributable to perils of the sea as to negligence, the plaintiff cannot recover. * * * That the jury were clearly to see that the defendants were guilty of negligence, before they could find a verdict against them."

It has been urged that it was a fault to have placed the sheep-wash —a liquid which, if it escaped from the barrels, was likely to cause damage—in the bow of the ship, although separate and somewhat

apart from any other cargo, and properly secured and dunnaged, because what did happen was very likely to happen; namely, that, being on an elevated part of the deck, if it escaped it would run back and flow over other articles. As to the proper placing of such barrels in such a cargo, there is no sufficient testimony produced to refute the statements of the stevedores that it was a customary and proper place to put it. It could not be placed under articles of weight, and, wherever placed, if it escaped it was likely to spread. As it was, the damage would not have been considerable but for the fact that the shifting of the casks of soda-ash broke down the ventilators, and the rolling of the ship caused it to flow over the combings of the between-deck hatches, which were 8 to 10 inches in height.

I have spoken principally of the damage to that part of the libelants' wire which was in the forepart of the ship. That which was under Nos. 3 and 4 hatches must have been but slightly injured; it did not come in contact with the sheep-wash, and was only damaged slightly by a small quantity of soda-ash which got on it from the one or two broken casks of soda-ash which broke in that part of the ship during the storms.

On the whole testimony, I think the libel must be dismissed.