918

FAGUNDES SUCENA & CIA v. MISSISSIP-
PI SHIPPING CO., Inc.

No. 1426.

United States District Court
E. D. Louisiana, New Orleans Division.

Dec. 23, 1952.

Deutsch Kerrigan & Stiles, Robert E.
Leake, Jr. and Francis Emmett, New Or-
leans, for libelant.

Terriberry, Young, Rault & Carroll and
Benjamin W. Yancey, New Orleans, for
respondent.

WRIGHT, District Judge.

Libelant seeks redress for damage by salt
water to wheat flour carried as cargo by
respondent. The damage is admitted and
the defense is laid under Section 4(2) (a)

of the Carriage of Goods by Sea Act, 46
U.S.C.A. § 1304(2) (a) on the theory that
the damage was caused by an "Act, neglect,
or default of * * * the servants of the
carrier in the navigation or in the manage-
ment of the ship". The issues of fact and
law having come on to be heard on the
pleadings and proofs of the parties and due
deliberation having been had, the court now
makes the following findings of fact and
conclusions of law:

Findings of Fact.

1. At all material times libelant was a
partnership duly organized and existing
under the laws of the Republic of Brazil,
with its principal office in Sao Paulo.

2. At all material times respondent was
a Louisiana corporation with its domicile
in New Orleans and was engaged in busi-
ness as a common carrier of merchandise
by water for hire. It was the owner and
operator of the steamship Murray M. Blum,
a Liberty ship built in 1944.

3. On or about December 7, 1946, the
Kansas Milling Company delivered a con-
signment of 9063 sacks of wheat flour to
respondent at New Orleans for carriage
aboard the SS Murray M. Blum to Santos,
Brazil, consigned to the order of shipper
with instructions to notify libelant, the ulti-
mate consignee.

4. Respondent accepted the cargo as
being in apparent good order and condi-
tion and, in consideration of freight charges
to be paid, contracted to carry the con-
signment from New Orleans to Santos.

5. Respondent stowed 2891 bags of flour
in the forward deep tanks of the vessel,
5372 bags in the No. 1 hold and 800 bags
in the No. 3 hold.

6. This libel concerns the bags stowed
in the deep tanks and the No. 1 hold, the
stowage of which was approved by the
regular inspector of the New York Board
of Underwriters in New Orleans.

7. The deep tanks of the SS Murray M.
Blum are located at the bottom of the No.
1 hold, which is the forward hold. The
vessel's forepeak tank is located immediate-
ly forward of and adjacent to the deep
tanks of the lower No. 1 hold. The deep
tanks were originally intended for the car-

riage of liquid cargo. At the time of the voyage in question, however, the vessel's piping was modified so that the only lines leading from or into the deep tanks were the port and starboard bilge lines. There were no lines connecting the forepeak and deep tanks.

8. Each deep tank was fitted with a bilge well 30" deep from which the bilge lines ran aft to the fire and bilge pump located on the port side of the engine room, which was used to pump these bilges. These lines were fitted at the bilge wells with manual deck-operated stop-valves which stop-valves were ordinarily left in an open position. There was another manually operated stop-valve in each of these lines just aft of the fireroom bulkhead. These valves normally were in a closed position and were opened when the deep tank bilges were pumped. From these valves the bilge lines run inboard to a common main bilge line which was fitted to the suction manifold serving the fire and bilge pump. In this line at the manifold was another manually operated stop-valve which, unless the bilges were being pumped, remained closed. From this manifold bilge water was expelled through the fire and bilge pump.

9. The suction manifold serving the fire and bilge pump was fitted with four manually operated stop-valves. One valve, as has been shown, controlled water from the bilge line. Another valve controlled the flow of water in the main engine cooling system. A third valve controlled the flow of water from the sea-suction chest. The fourth valve controlled the ballast lines.

10. The bilge lines from No. 1 hold were arranged in a fashion similar to those lines serving the forward deep tanks, except that these lines were equipped with an automatic non-return valve just aft of the fireroom bulkhead instead of the manually operated stop-valve. The function of this non-return valve was to prevent water from backing up into the bilges.

11. The vessel sailed from New Orleans on or about December 9, 1946 and arrived at its first port of call, St. Thomas, Virgin Islands, on December 16, 1946. At St. Thomas, the vessel's forepeak tank was filled with fresh water through the fresh water lines of the vessel. These fresh water lines and pump had no connection whatever with the bilge lines or pump or any cargo compartment. The filling of the forepeak tank was commenced at 10:30 A.M. and completed at 1:30 P.M. on December 16, 1946.

12. Prior to December 16, 1946, bilge soundings had been normal. At 9 A.M. on December 16, bilge soundings were normal, but at 5 P.M. that same day, after the forepeak tank had been filled, bilge soundings in the No. 1 and No. 2 holds showed a marked increase. Despite pumping, these bilges continued to gain water on December 17 and 18, as did the bilges in the deep tanks:

| Date | Hour | No. 1 Deep Tank | | No. 2 Deep Tank | | No. 1 Hold | | No. 2 Hold | |
|---|---|---|---|---|---|---|---|---|---|
| | | Port | Stbd. | Port | Stbd. | Port | Stbd. | Port | Stbd. |
| 12/16/46 | 9 AM | 0 | 1" | 2" | 0 | 2" | 1" | 0 | 0 |
| | 5 PM | 0 | 2" | 3" | 2" | 6" | 4" | 9" | 2" |
| 12/17/46 | 8 AM | 0 | 0 | 15" | 0" | 16" | 4" | 15" | 5" |
| | 5 PM | – | – | 15" | 0" | 18" | 16" | 20" | 9" |
| 12/18/46 | 8 AM | 0 | 0 | 24" | 0 | 0 | 2 | 16" | 8" |
| | 5 PM | 0 | 0 | 3" | 1" | 0" | 0 | 5" | 3" |

13. From December 18 to December 27, 1946, bilge soundings in these compartments were, for the most part, normal.

14. On December 27, 1946, at Recife, Brazil, the vessel again took fresh water into her forepeak tank, the operation being completed at 11:25 A.M. The procedure was the same as at St. Thomas. The vessel's logs do not show when the operation began, but considering that the previous operation at St. Thomas took three hours, and that on this occasion the vessel was shifted several times during the operation, it is reasonable to conclude that the filling required more than three hours' time.

920

15. Immediately following this filling of the forepeak tank, bilge soundings disclosed that the No. 1 deep tank compartment was flooded, and that bilges in other forward cargo compartments showed an abnormal amount of water. The condition prevailed through December 31, after which soundings were more or less normal:

| Date | Hour | No. 1 Deep Tank | | No. 2 Deep Tank | | No. 1 Hold | | No. 2 Hold | |
|---|---|---|---|---|---|---|---|---|---|
| | | Port | Stbd. | Port | Stbd. | Port | Stbd. | Port | Stbd. |
| 12/27/46 | 8 AM | 23″ | 0″ | 23″ | 0″ | 0″ | 23″ | 0″ | 0″ |
| | 5 PM | 60″ | 0″ | 0″ | 0″ | 0″ | 15″ | 30″ | 0″ |
| 12/28/46 | 8 AM | 8″ | 14″ | 0″ | 0″ | 0″ | 1″ | 0″ | 0″ |
| | 5 PM | 0″ | 1″ | 0″ | 0″ | 0″ | 1″ | 0″ | 0″ |
| 12/29/46 | 8 AM | 3″ | 8″ | 0″ | 0″ | 0″ | 2″ | 0″ | 0″ |
| | 5 PM | 12″ | 8″ | 0″ | 0″ | 0″ | 1″ | 0″ | 0″ |
| 12/30/46 | 8 AM | 14″ | 6″ | 0″ | 0″ | 0″ | 0″ | 0″ | 0″ |
| | 5 PM | 7″ | 6″ | 0″ | 0″ | 0″ | 0″ | 0″ | 0″ |
| 12/31/46 | 8 AM | 14″ | 0″ | 0″ | 0″ | 21″ | 21″ | 0″ | 0″ |
| | 5 PM | 6″ | 1″ | 1″ | 1″ | 0″ | 0″ | 0″ | 0″ |

16. On December 28, 1946, the day after the vessel took fresh water in her forepeak tank at Recife, the following entry was placed in the vessel's log: "Fresh water in forepeak filled December 27, 1946, down seven feet, indicating water in bilge coming from forepeak tanks. Tank not refilled. No radical gain in water of bilge."

17. The SS Murray M. Blum arrived at the port of Santos on February 12, 1947, and the cargo of flour involved was discharged and delivered into the custody of the Brazilian customs authorities between February 20, 1947 and March 5, 1947. Discharge of the cargo revealed extensive water damage to libelant's flour which was stowed in the deep tanks and No. 1 hold of the vessel.

18. Competent comparative chemical analyses of samples of the flour gave a positive chloride reaction as well as evidence of the presence of traces of sulphates, indicating that the damage to the flour was due to contact with salt water.

19. After the cargo was unloaded at Santos, the forepeak tank was tested and the skin of the ship examined. No evidence of leakage was disclosed and the forepeak tank was used for fresh water without further incident on the remainder of the voyage.

20. An examination of the piping system of the vessel discloses the possibility that sea water entering through the sea suction could have found its way into the bilge suction system and thence into the compartments where the cargo in suit was stowed. For this possibility to have eventuated as to the forward deep tanks, it would have been necessary for at least one, and probably three, valves in the deep tank bilge lines, normally closed, negligently to have been left open on two occasions. Pursuing this possibility relative to the No. 1 hold, unless we are to assume that the water came up through the open hatches over the forward deep tanks, it would have been necessary on two separate occasions, for one valve in the bilge line, normally closed, negligently to have been left open at the same time that the automatic non-return valve in that line was rendered inoperative. The record discloses no direct evidence showing that the valves in question were left open or were rendered inoperative and the circumstantial evidence shown does not negative other reasonable hypotheses.

21. The record fails to disclose the cause of the damage to the cargo in question. Both sides have offered plausible explanations, none of which is supported by the evidence.

Conclusions of Law.

1. This court has jurisdiction over the subject matter of this suit and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

■ **2.** The merchandise in question, having been received by respondent in apparent good order and condition and having been delivered by respondent in a damaged condition, a prima facie case for the libelant has been made, and respondent has the affirmative burden of proving that the cause of the damage was one for which it has no responsibility under its bill of lading, or under the Carriage of Goods by Sea Act. Clark v. Barnwell, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985; The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546; Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Orient Insurance Company v. Flota Mercante del Estado, D.C., 102 F. Supp. 729, affirmed 5 Cir., 198 F.2d 740.

■ **3.** The respondent has failed to carry the burden of proving that the cause of the damage was one for which it has no responsibility under the bill of lading or the Carriage of Goods by Sea Act.

Let a decree be prepared pursuant to these findings.