MAINWARING *v.* BARK CARRIE DELAP, etc.

*(District Court, S. D. New York. March 6, 1880.)*

GENERAL CARGO—STOWAGE—DANGEROUS ARTICLE—LIABILITY OF SHIP.
—"The ship is not responsible for injury necessarily resulting to the goods of one shipper, by a general ship, from their being carried in the same vessel with the goods of other shippers, which, by usage, are a proper part of the same general cargo; but if such injury, nevertheless, could have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods, then it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss occasioned by his negligence and inattention to his duty."

Certain bales of empty bags were shipped on an open-beam vessel, put up as a general ship, under a bill of lading stipulating for their delivery in good order, the "perils of the sea" excepted. The bags were placed on a temporary deck of planks, covered with mats, directly over certain tierces of bleaching powder stowed in the lower hold. *Held,* that the ship was liable for the destruction of such bags caused by the fumes of the bleaching powder, set free by the pressure and working of the cargo during heavy weather, without any negligence upon the part of those in charge of the vessel, in the absence of direct proof that such stowage was necessary to the trim of the vessel.

In Admiralty.

*E. G. Bell,* for libellant.

*A. J. Heath,* for claimants.

CHOATE, J. This is a suit to recover damages for injury done to bales of empty grain bags, shipped by the libellant at Liverpool for New York, under a bill of lading which stipulated in the usual form for their delivery in good order, "the perils of the sea" excepted. The bark was put up as a general ship. Her cargo consisted of 323 tierces and 40 casks of soda ash, 300 drums of caustic soda, 265 tierces of bleaching powder, 1,850 sacks of salt, 10,000 fire-brick, 1,703 empty petroleum barrels, 840 boxes of cutch, and 110 bales of bags, of which 67 were shipped by the libellant. There was some other miscellaneous cargo, of no great amount, which it is unnecessary to mention in detail. The bark is what is called an open-beam vessel, having two decks, the lower deck being laid only for a space about 25 feet long in the bow and about 30 feet long in the after-part of the vessel. Upon the beams

between these two permanent decks were laid planks, and over the planks were laid mats. The planks were laid edge to edge, but rather loosely, together. The soda ash and the bleaching powders were stowed in the lower hold, two and three tiers high. Between two of the beams, amidships, the bricks were stowed, on top of the casks. This cargo filled the the lower hold up to within a foot or a foot and a half of the beams. The empty barrels were stowed between decks, mostly in the fore peak. The salt was stowed between decks, partly aft and partly amidships. The cutch was stowed on the salt. The bags were stowed in two places between decks, part of them on this temporary deck of planks covered with mats, directly over the bleaching powders, and part of them aft on the permanent deck.

The vessel left Liverpool on the third day of November, 1877, and did not arrive at New York until the eighteenth day of January, 1878. She had a very tempestuous voyage, was obliged to put into Holyhead and remain there about three weeks, and on the tenth of January she encountered a gale of great violence, which lasted three days, during which she was, for a short time, on her beam ends, and took in some water, which the pumps could not reach. After this gale the vessel was somewhat listed to port. Some of the casks of bleaching powder and soda ash were broken. Upon arrival the bales of bags were delivered in good order except some 32, which were corroded and eaten on the outside so that the fabric crumbled and became dust. This is the effect upon such fabrics of the fumes of bleaching powders, which consist largely of the chloride of lime. The evidence shows clearly that the bales of bags did not come in direct contact with the bleaching powders, but that the injury was done by the fumes arising from them. It is proved, also, that such fumes, dangerous to such fabrics as bags, arise from the bleaching powders wherever the powders are free—that is, not enclosed in casks—even without the powders being wet. It further appears that these bleaching powders have a destructive effect upon the hoops of the casks in which they are enclosed, having a tendency to cause the casks to fall apart.

There is, I think, no doubt, upon the testimony, that the bleaching powders and soda ash were properly dunnaged and stowed in the lower hold, and that the breaking up of some of the casks was owing to the pressure and working of the cargo during the heavy weather encountered, and the effect of the bleaching powders on the casks themselves during the long voyage, and that it could not have been prevented by any reasonable care and skill on the part of those in charge of the vessel.

It was not shown, by any direct evidence, in what part of the ship the damaged bags were stowed; whether they were those stowed on the temporary deck above the bleaching powders, or aft on the permanent deck. It is the theory of the claimants that the fumes in the hold of a ship penetrate into all parts of the ship, and that they are especially strong in the after-part. In the absence of proof, however, which it would seem that the vessel could easily have produced, of the place from which the damaged bags came, I am unable to believe that these dangerous and corrosive fumes passed up, by and around these bales of bags on the temporary deck immediately above, without injuring them, to attack with accumulated destructive force other bales at a greater distance. I think, although the claimant's theory has some support in the opinions of some of the witnesses, the weight of evidence is that the danger of injury from bleaching powders depends in a great manner on the distance between them and the articles liable to be injured, and that it must be taken as proved that the damaged bags were those immediately above the bleaching powders on the temporary deck.

It is also clearly proved that the carrying of bleaching powders and soda ash in the same vessel with bales of bags, as parts of a general cargo, is a well-established usage of the trade between Liverpool and New York, and that the usage extends to the use of open-beamed vessels, like this bark, for the carriage of such general cargoes, including these articles.

It is claimed, on the part of the libellant, that the injury was caused by the stowing of the bales of bags too near the bleaching powders, and upon this temporary and loosely laid deck,

in such a way that they would be directly exposed to the fumes that would arise from the bleaching powders, if, as in fact happened, any of the casks should become broken during the voyage; that a proper and reasonable care, having regard to this particular danger, required that the bales of bags should have been stowed on the permanent deck, or further away from the bleaching powders. On the part of the claimants, it is contended that the injury was caused by the perils of the sea, by which the casks were broken up, and that the stowage of the different parts of the cargo was proper, and with due and reasonable care for the protection of one part of it against injury from other parts, and that the stowage of part of the bales of bags on the temporary deck was necessary to the proper trim of the ship.

Both parties have undertaken to prove a usage—the libellant, that the usage of the trade requires a greater separation between bleaching powders and bales of bags or similar fabrics; and the claimants, that the usage of the trade is to stow the bales of bags as near to or nearer to the bleaching powders than in this case, and without interposing any more effective barrier between them. But, after the examination of a very large number of witnesses, the result is that there is no usual mode of stowage in this respect, but that some masters and some stevedores take more and some take less precautions against this particular danger; that in steamers, which are built in compartments and afford much greater facilities for separating cargo, the bleaching powders are carried in separate compartments from bales of bags and similar goods liable to be injured by the fumes; that in sailing ships the bleaching powders are usually carried in the lower hold, and the bags generally, but not always, between decks, but that on this particular point of stowing the bags on a temporary deck, immediately above the bleaching powders, there is no settled usage. Although it appears that in many cases they have been stowed in positions of equal or greater exposure, yet many careful persons place them further away, or as far away as possible consistent with the proper stowage in other respects and the trim of the ship.

The rule of law seems to be well settled that the ship is not responsible for injury *necessarily* resulting to the goods of one shipper, by a general ship, from their being carried in the same vessel with the goods of other shippers, which, by usage, are a proper part of the same general cargo; but "if such injury, nevertheless, could have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods, then it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss occasioned by his negligence and inattention to his duty." This is the rule, even though the proximate cause of the injury is a peril of the sea, which brings the injurious force or quality of the dangerous article into operation upon the other. *Clark* v. *Barnwell*, 12 How. 280; *Lamb* v. *Pinkman*, 1 Sprague, 343. Where the carrier is innocently ignorant of the dangerous qualities of the article shipped—as, for instance, where the article is new in commerce, and its properties not known within commercial experience in the particular trade, and in fact unknown to those charged with its carriage, or where there is nothing to indicate or create a suspicion of its being dangerous—it is not negligence in the carrier to omit such precautions as the exercise of reasonable prudence would require, if the dangerous qualities of the article were known. *The Nitro-Glycerine Case*, 15 Wall. 524; *Pierce* v. *Winsor*, 2 Cliff. 18; *Braise* v. *Braitland*, 6 Elb. Bl. 485. In this case, however, it is shown that bleaching powders have long been an article of commerce in the Liverpool trade, as parts of the general cargoes, and that the dangerous and corrosive qualities of their fumes are well known, a matter of common knowledge in the trade, and so also of the effect of the breaking of the casks in liberating the fumes, and the liability of the casks to come apart from the action of the powders. The reasonable care that must be exercised to exonerate the carrier must, therefore, be measured by the known danger and his means of guarding against it. In discussing a similar question, where paper stock was injured by oil and coal dust, Judge Blatchford says: "The vessel being up as a general

ship, the libellants may *not* be at liberty to say that it was negligence to carry oil in the same vessel with paper stock; but yet the proposition set forth in the answer, that, as the shippers of the paper stock knew that the oil was to be taken by the vessel, such shippers assumed all risk of damage to the paper stock from the oil, is not a sound one. The true rule is that the peculiar character of the coal oil, its pungent odor, its volatile character, the damage certain to result to other cargo from contact with it, the liability of the casks containing it to break by pressure from the working of the vessel and let out the oil, demanded especial care in stowing the paper stock and the oil with reference to each other." The *Ship Sabioncello*, 7 Ben. 360. The same principle is clearly applicable here; and the question is whether the danger to which the bales of bags were exposed from the bleaching powders and from which they suffered injury was so far likely to happen that, in the exercise of that care which a prudent man would exercise in the conduct of his own affairs, it should have been anticipated and guarded against, and then whether there were means to guard against it. The ship is not responsible for the unusual prolongation of the voyage, nor for the violence of the wind and waves; yet I think a reasonable prudence and care would, upon the evidence, have anticipated that, in the course of the voyage, some of this bleaching powder would be likely to get out of the casks, and to injure the bales of bags stowed with reference to the bleaching powders as these were stowed. If this had been anticipated the precaution to guard against the danger was obvious enough to stow the bags further away, or on the permanent deck, or to place other cargo not liable to injury beneath them on the temporary deck, if it was of a nature to obstruct the passage of the fumes.

It is suggested that the stowage that was made was necessary to the trim of the ship, but this is not proved. There is no testimony on the subject. It is, doubtless, true that in a general ship no particular shipper can demand that his goods be put in a particular place, or in the very safest place for them. The stowage must necessarily have reference to the

trim of the ship. The safety of the ship is of greater concern to all than the safety of any particular part of the cargo. And this consideration may modify what would otherwise be the duty of the ship-master in separating articles dangerous one to the other. But in the absence of evidence it cannot be assumed that the cargo could not have been, in this respect, with safety to the ship, stowed otherwise than it was stowed. The proof shows clearly that the other bales of bags were stowed more safely as against this particular peril, and it is not shown that these bales could not equally have been protected from the natural effects of the bleaching powders. If there was any difficulty in doing so, growing out of the necessity of trimming the ship properly, the claimants could easily have shown it. Therefore, they cannot now make this answer to the libellant's claim.

Decree for libellant, with costs, and a reference to compute damages.