HAMILTON, etc., *v.* BARK KATE IRVING.

(*District Court, D. Maryland.* February 4, 1881.)

1. GENERAL CARGO—BLEACHING POWDERS AND COTTON TIES—STOWAGE —LIABILITY OF SHIP.

Iron cotton ties were shipped in a general ship. They were stowed next to bleaching powders and soda ash, with not over three feet between. After a rough voyage the cotton ties were found to be corroded by particles of bleaching powder which had sifted on to them. *Held,* that the destructive effect to cotton ties of contact with bleaching powders being well known, it was not proper stowage to place them so near together without adequate precaution to guard against injury.

*The Svend,* 1 Fed. Rep. 54.

*Mainwaring* v. *Carrie Delap,* 1 Fed. Rep. 874.

2. MEASURE OF DAMAGES.

> *Held,* under the circumstances of this case, that the market value of the damaged cotton ties was to be determined by the price they actually produced when sold, and not by the testimony of experts.

In Admiralty. Damage to Cargo.

*Wm. T. Brantly* and *A. Sterling, Jr.*, for libellants.

*Sebastian Brown,* for respondents.

MORRIS, D. J. There were shipped at Liverpool on board the bark Kate Irving 4,076 bundles of hoop iron, known as "cotton ties," to be delivered to the libellants at Baltimore. The ship took a general cargo, a large part of which consisted of bleaching powders and soda ash in casks. The hoop iron was delivered in Baltimore in a damaged condition, and it is for this damage that the libellants seek to recover. The bark had two decks, the lower one having open beams. This open-beam deck was covered in part by plates of iron, which formed part of the cargo, and on these were placed the hoop iron and the chemicals. In the forward part of the vessel was stowed part of the hoop iron; then came a space, of not over three feet, filled with dunnage; then came the chemicals, extending to abaft the main hatch; then there was another space, of from three to four feet, filled with dunnage; and aft of that the balance of the hoop iron was stowed. The vessel was not full. There was but one tier of casks on the between-deck, about four feet high, and the hoop iron was in small bundles, piled up about two feet high, and extended across the ship from side to side. The hoop iron used for cotton ties, such as these were, is in thin, narrow strips, painted black, but not put up in boxes or covered.

The vessel had a very rough voyage, and some of the casks of chemicals were more or less broken and their contents scattered; and, upon delivery, a large part of the cotton ties were found to be damaged, by being corroded by particles of the bleaching powder which had come in contact with them.

The proof shows that the casks of chemicals were well and securely stowed and dunnaged, and that they were no more injured than might easily result from a rough voyage with

the best possible stowage; but the libellants claim that the cotton ties were improperly stowed with reference to the chemicals, and particularly with reference to the bleaching powders, in that they were placed on the same deck with a space of not more than three feet between them.

Bleaching powder (chloride of lime) is well known to be a destructive chemical, which quickly corrodes iron when it comes in contact with it. It is shipped in lightly-made casks, each containing about a ton in weight, and, on a rough voyage across the Atlantic, it is a common occurrence for heads of the casks to be broken, and even when the casks are not broken the contents will sift out between the staves from the working of the casks one against the other; as one of the witnesses said, "the beating of the casks together raises a dust and scatters it about." With so large a quantity of these chemicals filling all the middle of the ship, and with so much vacant space over them, between them and the main deck in which the particles could be wafted about, I am constrained to think that it was not proper to have put the cotton ties within three feet of the chemicals, so near that if any of this injurious substance sifted out it was almost certain to fall upon and greatly injure the iron. The dunnage between the cotton ties and the casks did nothing more than prevent them from shifting, and was of but little use to prevent the particles of the chemicals from falling on the ties if they got free. There was no bulkhead or covering of any sort.

That the bleaching powder did get on the iron and did seriously corrode a large part of it is fully proved. The white substance was found on the corroded iron, and the chemical analysis of it proved conclusively what it was. The corrosive and destructive effect of the bleaching powder was well known, and also the peculiar liability of the hoop iron to be injured by it, but no precautions were taken at all adequate to guard against the danger. It is admitted that bleaching powder is commonly carried as part of a general cargo from Liverpool to Baltimore, but no evidence was produced to show that it was customary, or that experience had proved it to be

safe, to carry hoop iron stowed in' such close proximity to it. On the contrary, such testimony as has been produced in this case on that subject tended to show the contrary.

The libellants' case is, it seems to me, a stronger one than *Mainwaring* v. *Bark Carrie Delap*, 1 FED. REP. 874, in which Judge Choate, upon the facts proved before him, held the ship liable for injury to empty grain bags caused by the fumes of bleaching powders carried as part of a general cargo.

There was in the bill of lading for the cotton ties an exception by which the ship was not to be accountable for damage from perils of the sea or from rust; but, as I have already indicated, the libellants have, in my judgment, sustained the burden of showing that the damage was not ordinary rust, but was a corroding caused by contact with a destructive chemical, and resulted from the negligence of the carrier, and that without that negligence the rough weather would not have caused the injury. No water touched the ties, and their position was not shifted. The injury resulted solely from the bleaching powder getting on to them. *Richards* v. *Hansen,* (*The Svend*) 1 FED. REP. 54.

With regard to the amount of damage I have had some difficulty. There was produced for the libellants the testimony of several merchants dealing in iron, whose evidence went to show that the market value of about one-half of the cotton ties was diminished 50 per cent. by the damage they had sustained. The custom-house officials, in appraising the goods for duties, estimated that one-half had been damaged to the extent of 40 per cent., and allowed that rebate from the invoice price in collecting the duties. It appears, however, that the libellants had intended to sell this importation through their commission merchants, and did sell through them, and that after cleaning and repainting some of the hoops, and by making some extra exertion and selling them in smaller lots, the commission merchants succeeded in disposing of them at prices not very much below the full market price for perfect merchantable goods.

Undoubtedly, the proper measure of damage in such cases is the difference between the market value of sound and the

market value of the unsound goods at the time of delivery. It is, however, often difficult to arrive at the market value of unsound goods. It may be that damaged goods of the particular kind are not often dealt in. It is often difficult to find merchants who will buy unmerchantable goods at any price, although to the consumer they may be as serviceable as before they were damaged. In this case one of the principal iron merchants, called as a witness, said he would not have taken the damaged cotton ties at any price. I am satisfied, therefore, that it will be much safer to take as the market price of these damaged goods the price they actually produced when sold, there being no proof of any change in the market.

I think the libellants should recover the difference between the amount they have received from sale of the goods and the amount they would have received if the goods had not been damaged, together with the charges for putting them in a salable condition; less, however, the amount of rebate of duties allowed to them, and less the freight due the ship.