## THE CHASCA.[1]

*(District Court, S. D. New York.*  February 11, 1885.)

SUFFICIENCY OF DUNNAGE—PERIL OF THE SEA.

The bark C., laden with nitrate of soda, in bags, while on a voyage from Pisagua to Hampton Roads, under a charter of affreightment which exempted her from liability for losses from perils of the seas, encountered heavy weather, and was thrown on her beam ends, in which position she lay for about 48 hours. She was finally nearly righted.  On arrival she was found badly strained and unseaworthy; and about 200 tons of the soda had been dissolved in washed-out spaces, 30 feet long by about 6 wide, along the bilges on each side, abreast of the main hatch.  The dunnage was so placed as to be held in position by the bags only.  On arrival, the dunnage along the washed-out places was found to have fallen down.  In all the rest of the ship it was in proper place.  No specific negligence in respect to the dunnage was alleged in the libel; and no evidence was given of any custom to fasten the side dunnage.  The respondents proved that the vessel was dunnaged in the usual manner.  *Held,* that the water was admitted through the straining of the vessel when thrown on her beam ends, which dissolved a portion of the cargo, by reason of which the dunnage fell before the pumps could be made effective; and the dissolving of the cargo, after the dunnage was down, continued for the rest of the voyage.  *Held, also,* that the weight of proof showed that sufficient open spaces were left by the dunnage to conform to the custom, and that, as the bark was dunnaged in the usual manner at the place of shipment, the court had no right to assume that it was negligence on the part of the bark to rely upon the cargo to keep the dunnage in its place, there being no contrary evidence on that point; that the damage, therefore, resulted from a peril of the sea, and the vessel was not liable.

In Admiralty.

*Sidney Chubb,* for libelants.

*Owen & Gray,* for claimants.

BROWN, J.  This libel was filed to recover damages for the non-delivery and loss of about 200 tons of nitrate of soda, part of a cargo of about 900 tons, or 6,546 bags, which were shipped at Pisagua, Chili, on board the bark Chasca, bound for Hampton Roads and orders, in June, 1883.  The bark was chartered to the libelants under a charter of affreightment that exempted her from liability for losses by perils of the seas.  The question litigated was whether the loss of the nitrate is to be ascribed to perils of the sea, or to insufficient or improper dunnage.

The bark sailed from Pisagua on June 21st.  About the middle of July she met with very heavy weather, and a succession of gales, lasting about three weeks.  On the nineteenth of July, in a very severe gale, she was thrown upon her beam ends, shifting her cargo between-decks to the port side.  She lay in that condition for about 48 hours, in a high sea; after which she wore round so as to be upon her port tack.  She was then partially righted by trimming the cargo between-decks, though still having a considerable list to port, which remained

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

during the rest of the voyage. She arrived at Hampton Roads about October 25th, unseaworthy and cranky, through loss of so much cargo in her lower hold, and was towed to New York about the first of November. On examination there was found in her lower hold a space of about 30 feet in length by 6 or 8 feet in width, in the wings on each side of the ship, abreast of the main hatch, where the bags were wholly or partially empty, being washed out by water; and the side dunnage there was nearly all down. Forward and aft of this washed-out space, on each side, the bags were dry and intact; and the dunnage was in place as when loaded. There was no shifting of the cargo in the lower hold. On discharging the cargo it appeared that about 100 tons on each side had been dissolved and lost in these washed-out spaces. The cargo in the center of the ship, fore and aft, over the keelson, and to the extent of four tiers of bags on each side of the keelson, was uninjured. It is evident that the loss of the soda arose through its being dissolved in the water that came in contact with it along the bilges, as the vessel rolled from side to side; while there was at no time sufficient water to reach above the height of the dunnage along the keelson amid-ships, as the water washed from side to side.

The weight of testimony is clearly to the effect that the cargo was well dunnaged, and in the usual manner, when loaded, giving about a foot of space above the floor of the hold, and from 14 to 16 inches along the turn of the bilge. Two witnesses swear to this positively. It is confirmed by the condition of the dunnage forward and aft of the washed-out spaces, as testified to by careful observers; and there is no reason to suppose that it was different abreast of the main hatch from what it was elsewhere. The testimony, based on the examination made after the dunnage was all down in the washed-out spaces, is insufficient to countervail this proof. There is no question that the vessel encountered very severe weather. Upon arrival at Hampton Roads she showed nearly all over her marks of very severe strain and injury. These injuries, and the leaks arising from them, would naturally produce all the water in the hold necessary to account for the loss. Mr. Reed, a very competent expert, so testifies, and no one contradicts it. A clear mark of a water-line was apparent on both sides of the ship along the washed-out spaces. This was about two feet above the floor, as stated by some of the libelant's own witnesses. Mr. Reed, for the defense, states this with more particularity, and testifies that no dunnage could have prevented the loss of cargo with such a depth of water along the bilges. Water at the point of saturation holds in solution about half its weight of nitrate of soda. To dissolve and carry off 200 tons of nitrate of soda, 400 tons at least of water must, therefore, have passed through the hold and the ship's pumps; or an average of over four tons a day from the time the bark was thrown upon her beam ends until she arrived at Hampton Roads. The fact that so great an amount of water was necessary to carry off

this soda is cited by the libelant, and, as I think, conclusively, to show that neither the whole loss, nor, indeed, any great part of it, took place during the 48 hours' time that the vessel was lying upon her beam ends. A small fraction of the amount of water necessary to dissolve all this soda, if it were in the hold at any one time, would have submerged nearly all of the cargo there; whereas, the fact that along the keelson the cargo was not injured, shows clearly that there could have been but a comparatively small amount of water in the hold at any one time. Four tiers of bags on each side of the keelson were unharmed; only the outer three tiers were more or less damaged. That the loss of the nitrate was gradual, and by a long-continued process, is further proved by the fact that the crankness of the bark, which arose only from the loss of nitrates, increased gradually up to the time she reached Hampton Roads.

These circumstances, it seems to me, indicate clearly enough the way in which the loss of the nitrate took place. When the bark was thrown upon her beam ends her leaks increased, as a consequence of the severe strain on 'her hull; and as the pumps were unable to reach the water along the port side while the ship lay in that position, the water accumulated there until, at the turn of the bilge, it rose above the 14 or 16 inches space allowed by the dunnage. Lying in this position for 48 hours in a heavy gale and rolling badly, the nitrates in the bags upon the port side were rapidly dissolved, and the dunnage, which depended upon the bags to hold it in position, being thereby loosened, became wholly disarranged and broken down. The bags at the sides against the dunnage were but two tiers high, and thence towards the center were piled gradually higher. When the bark wore round and came upon her port tack, with heavy weather still continuing and much rolling of the ship, the accumulation of water at once passed from the port side to the starboard side, rising at once above the dunnage there also, and soon producing on that side the same results by dissolving the lower bags and throwing down the dunnage. In the severe weather and the high sea the pumps were not able to be worked so as at once to bring the accumulation of water that passed from the port to the starboard side down below the dunnage in the starboard bilges, and in this way the water lines on both sides, as observed by the witnesses, were probably formed. When the captain and others went down into the lower hold after the heavy weather had subsided, about the fifth of August, i. e., between two and three weeks after the vessel was thrown upon her beam ends, they found the dunnage along the washed-out spaces all disarranged and down on each side. They endeavored to replace it to some extent, but could not do so effectively. No lights could be taken into the hold for fear of an explosion. During the remainder of the voyage, therefore, there was, in effect, no side dunnage at all along the washed out spaces to serve as a protection for that part of the cargo against the water that usually runs along the bilges. Hence

the bags were constantly exposed to the action of water there, and were constantly dissolving and settling down. In the ordinary rolling of the ship nothing that the pumps could do would prevent this process from going on continually in some measure, and in rough weather the action of the water would be more rapid and destructive, and this would be still further increased by the increasing crankness of the vessel through the loss of cargo. I do not perceive any special difficulty in the fact testified to, that the greater loss was upon the starboard side; for the loss arose chiefly through the breaking down of the dunnage caused by the water taken in, that could not be reached by the pumps, in the gale of July 19th. If the bark afterwards sailed more on the port tack than on the starboard tack, the action of the water and consequent loss would be greater, because longer continued, on the starboard side.

In this way, therefore, there is no doubt, I think, that the severe gale of the nineteenth of July was the true cause of the loss. Had the side dunnage and the floor dunnage been securely fastened at the bilges, otherwise than by the bags themselves, comparatively little damage would probably have been done. If it was the custom with such cargoes to fasten the dunnage securely, then the neglect of this precaution would have made this bark liable. The case of *The Tommy* is cited, in which the omission to fasten the dunnage to prevent its falling in rough weather was held negligence, for which the ship was liable. 16 FED. REP. 601, 607. But the cargo there was of a wholly different character. To rebut the charge of negligence, it is sufficient to show that the ship has been dunnaged in the manner usual and customary for such cargoes. Shear. Neg. § 6; *Baxter* v. *Leland*, 1 Blatchf. 526; *Lamb* v. *Parkman*, 1 Spr. 343, 351; *The Titania*, 19 FED. REP. 101, 107, 108; *The George Heaton*, 20 FED. REP. 323; *Clark* v. *Barnwell*, 12 How. 283; 3 Kent, *217.

The evidence in this case is to the effect that the bags of nitrate formed a very compact and solid mass; that the dunnage which, in this case, was without other fastening than such as the bags afforded, was secured in the usual and customary manner. Of the various witnesses examined by the libelants, I have found none who testify that it was usual or customary to secure dunnage otherwise than was done in this case. The dunnage of the rest of the cargo was in place, and is proved to have been done in the customary manner. I have no right to assume, therefore, that it was negligence in the ship to rely upon the bags to keep the dunnage in place, when it appears that such has been the usual practice with cargoes such as this.

There was no proof that the bark was not seaworthy when she left Pisagua. The water which dissolved the nitrates did not reach the cargo through her decks, nor, as in the case of *Hubert* v. *Recknagel*, through defects for which the ship is answerable. 13 FED. REP. 912. The cargo between decks was uninjured. The water plainly reached the hold through leaks in the sides or water-ways

caused by general strain. There was evidently no lack of diligence on the part of the bark in handling the pumps. The log and the proof show that they were well attended to. And, as I have said, there is no proof of neglect to dunnage this cargo in the way customary for such cargoes. The loss is attributable, therefore, to the perils of the sea originating in the severe gale of July 19th, and the throwing of the bark upon her beam ends. This was clearly a sea peril; and the same cause so disarranged the dunnage, without the ship's fault, as to subject the cargo to constant loss afterwards, which the vessel could not prevent. This was still, therefore, a peril of .the sea; and for such loss the ship, under the exceptions of this charter, is not liable. *The Shand*, 10 Ben. 294; *Transportation Co.* v. *Downer*, 11 Wall. 134; *Clark* v. *Barnwell*, 12 How. 272; *The Titania, supra.* In the case of *The Sloga*, 10 Ben. 315, cited by counsel, the evidence showed that the brig, though encountering severe weather, suffered no considerable injury, nor any leakage approximating to that in the present case, nor were there any such special causes of loss as existed here.

The libel is dismissed, with costs.