THE RANGOON MARU. NIPPON YUSEN KAISHA v. GRACE BROS. (India), Limited. SAME v. W. R. GRACE & CO.

Circuit Court of Appeals, Second Circuit. July 2, 1928.

No. 176.

1. Shipping ⟨⟩132(5⅜)—Evidence held to sustain finding that damage to cargo of bleaching powder was not result of negligent stowage (Harter Act [46 USCA §§ 190–195]).

In libel to recover damages to cargo of bleaching powder, evidence *held* to sustain finding that damage was not the result of negligence in stowing cargo in too warm part of steamer, but rather to establish that damage was a result of inherent defect, quality, or vice, within Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035), excepting carrier from liability in such case.

2. Evidence ⟨⟩512—Usage of trade, and not opinion of chemists, is test in determining negligence in stowing cargo.

Where witnesses experienced in stowage approved particular stowage of cargo, the usage of trade, and not the opinion of chemists, however sound, is the test whether there was negligence thereof.

3. Shipping ⟨⟩147—Carrier, accepting bleaching powder with knowledge of shipment, held not entitled to recover cost of transshipment and expense of discharging cargo because of fumes.

Carrier, accepting shipment of bleaching powder with full knowledge as to nature of shipment, *held* not entitled to recover cost of transshipment and expense of discharging cargo because of fumes of chlorine gas given off of such shipment, though lading authorized such recovery in case of dangerous goods, shipped without full disclosure of their nature.

Manton, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

Separate libels by Grace Bros. (India), Limited, against the steamship Rangoon Maru, claimed by the Nippon Yusen Kaisha, wherein W. R. Grace & Co. were impleaded, and wherein claimant filed a cross-libel, and by Nippon Yusen Kaisha against W. R. Grace & Co. Decrees dismissing the libels and cross-libel, and libelants and cross-libelant separately appeal. Affirmed.

Appeal from a final decree in admiralty by the libelant, Grace Bros. (India), Limited, dismissing a libel filed in rem against the steamship Rangoon Maru in a cause for cargo damage in which Nippon Yusen Kaisha, the claimant of the steamship, had impleaded W. R. Grace & Co., of New York, the shipper. Likewise appeals by Nippon Yusen Kaisha from a decree dismissing its cross-libel against Grace Bros. (India), Limited, to recover damages alleged to have been suffered by the Rangoon Maru, and also from a decree dismissing the libel of Nippon Yusen Kaisha against the shipper W. R. Grace & Co. of New York to recover the same damages. Affirmed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating and James H. Herbert, both of New York City, of counsel), for Grace Bros. (India), Limited, and W. R. Grace & Co., appellee.

Burlingham, Veeder, Masten & Fearey, of New York City (Ray Rood Allen and William J. Dean, both of New York City, of counsel), for Nippon Yusen Kaisha.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. In August, 1920, Grace & Co. of New York shipped on the steamship Rangoon Maru, then at the port of New York, 1,079 drums of bleaching powder for carriage and delivery to Grace Bros. of India. This suit was brought to recover damages to this cargo based on a claim of improper stowage. The bleaching powder, though lawful cargo, was a dangerous substance. It corroded the drums in which it was shipped and by the time the Rangoon Maru had reached Bombay, where she was to stop in her voyage, was giving off fumes of chlorine gas to such an extent that it had to be discharged. In doing this, 83 drums, "due to their corroded condition, collapsed when in the slings and fell into the water and were lost." The remaining 996 drums were transshipped on another vessel to Calcutta, where, because of their damaged condition, they were sold at a loss. The trial judge held that the goods were properly stowed and dismissed the libel. [1] The principal question here is whether the Rangoon Maru was negligent in stowing this cargo in too warm a part of the steamer.

The libelant says in the first place that Cockerill, who was employed in the Asiatic Department of W. R. Grace & Co., testified that he advised Tuomey, the freight agent of the vessel, to give the bleaching powder cool

stowage, away from the boilers, and asked Tuomey for stowage in Nos. 1 and 4 hatches that were farthest from the boilers. Cockerill also testified that he told Peterson, who superintended the stowage for the stevedores, that he would like "good, careful, cool stowage, away from the boilers." But he said that he "would not want to swear" that he used the word "boilers," or asked for stowage in Nos. 1 and 4 hatches, when he talked to Tuomey, and also testified that he did not know whether he used the word "cool" in talking with Peterson, and that it was "pretty hard to search back six years to say whether you said 'cool' or 'boiler.'" Peterson denied that he had any conversation with Cockerill about cool stowage, or stowage in any particular part of the ship, and said that Cockerill was on the ship at the time of loading, and saw and expressed satisfaction with the stowage, except that he wished additional dunnage for the bleaching powder, which was ordered accordingly. Cockerill testified that, although he was down at the pier, he was not on board the Rangoon Maru, or at least did not believe he was on board. The trial judge, however, heard Cockerill testify in open court and believed that he was on the vessel. Cockerill was concededly at the pier to look after cargo and his statement that he did not go on the vessel is not in accordance with the probabilities. Under all the circumstances we cannot regard the claim that there was an arrangement or request to stow the bleaching powder away from the boilers, or in Nos. 1 and 4 hatches, as substantiated.

It is next contended by libelant that the place of stowage was in the hottest part of the ship. It is doubtless true that stowage in the portion of the ship entered from No. 1 hatch would have been somewhat cooler, but the claim that the bleaching powder was stowed in a place that was especially hot does not seem to have been established.

"481 drums were stowed in the forward part of No. 3 'tween-decks immediately aft of the engine room bulkhead, being separated therefrom by about one foot of dunnage." This is what Judge Knox found at the trial, and it is not disputed.

The evidence is that No. 3 'tween-decks had six ventilators—two big ones right over the place where the bleaching powder was stowed. Moreover, No. 3 'tween-decks extended all the way aft, without any bulkhead between No. 3 and No. 4 hatches (Claimant's Exhibit A), so that the space was not a confined one, and the chief officer stated in his deposition that "while the ship was in the

Red Sea and the Indian Ocean we opened the hatches on every fine day to have ventilation; of course, ventilators were kept in trim all the time." Moreover, there was a bridge deck over the main deck at this point, which covered a part at least of the portion of the ship in which the 'tween-decks bleaching powder was stowed. The heat of the sun on the after portion of the main deck may have somewhat affected the temperature of the 'tween-decks compartment, but, in view of the large space extending without bulkheads back into the part entered by No. 4 hatch, it must have been a good airy place for stowage.

The remaining 598 drums of bleaching powder were stowed in No. 2 lower hold. The chief officer testified that there were at least four ventilators leading from this hold, and that when the ship was in the Red Sea and Indian Ocean the hatches were opened every fine day, and the ventilators were kept in trim all the time. It is earnestly insisted, however, that the drums were not stowed in No. 2 lower hold, but in what was called the "spare bunker" in that hold, which was directly against the steel fire room bulkhead. But it was denied by the chief officer of the vessel, by Peterson, who superintended the stevedoring, and by Dalton, who surveyed the stowage for the New York Board of Underwriters, that such was the stowage. Judge Knox held that the drums were not stowed next the boilers in No. 2, but were "in front of the wooden structure which marked the forward reach of the spare coal bunker. The bunker was filled with coal, and, if that fuel were used, it was probably not entirely consumed prior to reaching Bombay. Therefore the bunker, as well as the coal, would protect No. 2 from the heat of the engines."

The testimony of Peterson, Dalton, and Nakashima, the chief officer, is said to be contradicted by both protests of the ship, by the surveys of September 17th and 30th, and by the stowage plan as well.

No. 2 hold, in which these goods were stowed, had two hatches, called 2–A and 2–B, on the stowage plan. No. 2–B led both to the coal bunker and to the hold proper. It was natural enough to call it the spare bunker hatch, to distinguish it from the other one.

The protest of the master of October 18 and also the protest of November 12 spoke of the drums as "stowed in No. 2 spare bunker and No. 3 hatches," indicating nothing more than that they were reached by hatch 2–B. The survey report of November 30 is to the same effect, where it says "stowed in

No. 2, spare bunker, and No. 3 hatches." The survey of September 17, by the same surveyors, speaks of the "drums of bleaching powder stowed in Nos. 2, 3, and spare bunker." But Robertson, whose deposition was put in evidence, was a surveyor connected with Ericson and Richards, who made both these surveys and testified that the bleaching powder was stowed "in No. 2 which included the cross-bunker and No. 3 hold.". He also said that "in No. 2 hold bleaching powder was kept entirely separate from general cargo." This not only says that there was bleaching powder in the hold, but indicates, particularly by reason of the words "which included the cross-bunker," that it was all in the hold and not in the place reserved for "coal bunkers." The statement of Robertson, that the drums were stowed in "No. 2 which included the cross-bunker," apparently refers to the cross-bunker hatch space forward of the wooden bulkhead. The cross-bunker space aft of the bulkhead was not included in No. 2 hold, but was separated from it by the wooden bulkhead.

The stowage plan likewise, when properly viewed, seems to be consistent with the testimony of the witnesses. A paster was put on this stowage plan to show some cargo stowed on top of the bleaching powder. The words "Calcutta (Grace) drums bleaching powder" were written in the margin to the left of the paster, no space being available on the right side. If an arrow had been placed to the right of the words "drums bleaching powder," to the left of the paster, which were probably inscribed after the paster was added, there would probably have been no question. These words, though placed over the space for the spare bunker, could not be seen if placed elsewhere, and do not necessarily show that the drums were stowed there, especially when there was evidence that the drums could not be lowered through the small orifice that led into the spare bunker. At any rate, the documentary proof is not sufficiently clear and consistent to justify the rejection of the testimony of the only witnesses as to what was stowed in No. 2, as well as the finding of the trial judge. Moreover, if drums had been stowed in the spare bunker, separated from the fire room only by a steel bulkhead, they would have been in a place far less ventilated than the large airy space of No. 3, and would necessarily have been subjected to greater heat. Yet the drums in No. 3 were in far the worst condition. So, if it be thought that heat caused the damage, the greater damage to the drums in No. 3 is in itself highly indicative that none of the drums were stowed in No. 2 spare bunker.

If, as has been found, the drums in No. 2 hold were not stowed in the bunker hatch, there can be little doubt that they were subjected to no unusual heat. Moreover, libelant's witnesses Sussman, Renaut, and Sobell did not claim that the temperature would ever go above 100° in that place. Indeed, Sussman put the maximum at 97°, Renaut apparently at the temperature of the water, while Sobell's estimate was 100°. It is to be remembered that the temperature of the air only went about 90° on five days, and on these days it was apparently below 90° half of the time or more. It cannot be said that the libelant's experts thought that temperatures below 98.6° would be damaging to the bleaching powder, and if more only when continued for a protracted period. Libelant's question, put to its expert Snowden, assumed a temperature of 100 to 110 degrees Fahrenheit for a period of three weeks. Snowden said that would cause serious decomposition. Judge Knox was clearly right in holding that there was no proof of a continuance of a sufficiently high temperature to damage cargo stowed in No. 2. While 98.6° seems to have been the critical figure of libelant's expert Roberts, yet some of the estimates of Snowden and Ritter involved higher ranges. Snowden's letter to the New York Bureau of Explosives said that, if bleaching powder becomes heated over about 140°, "it tends to decompose and give off oxygen * * *" (Exhibit N).

All libelant's testimony as to temperatures in No. 2 and No. 3 hatches was based on estimates, for the only temperatures taken were outside temperatures of the air and water, not of the interior of the ship. There can be no doubt that these estimates were not only highly speculative, but that some of them were highly exaggerated. For example, Renaut estimated that the temperature in No. 3 'tween-decks would reach 120° to 125°, and put the temperature of the stoke hole and engine room at the same figure. It goes without saying that a large ventilated cargo space in 'tween-decks could not be anything like as hot as the engine room. Cocks, an experienced cargo surveyor called by the claimant, said that the estimated temperatures were exaggerated, and that the temperatures of the forward part of No. 3 and No. 4 'tween-decks would be generally the same. He added that the Rangoon Maru had safely carried in the forward end of No. 3 'tween-decks on her previous voyage dessicated cocoanut, a commodity that is damaged by ex-

cessive heat. Peterson also testified that the difference in temperature between No. 3 'tween-decks and No. 1 hold, which is claimed by libelant to have been the coolest part of the ship, was about four to five degrees, and Dalton's testimony was that it was only five or six degrees. Cocks' estimate was apparently the same as Dalton's.

What the exact temperature of No. 1 hold was as compared with the outside air cannot be determined. Libelant says that the temperature of No. 1 lower hold is the mean between the air and water, and in its brief has printed a table of average mean temperatures for that hold, which, on September 7th reached 90½°, and on September 8th, 91°. If 6° be added to the figures, they would still fall short of the critical figure of 98.6°, and this maximum would last but a short time. Moreover, it has been established, for the reasons already given, that the drums in No. 2 hold were properly stowed, and yet they went bad, so the deterioration of the cargo in No. 3 'tween-decks cannot be laid to excessive heat. Again, it is to be remembered that Ritter, a chemist, who was libelant's own witness, testified that there would have been no giving off of chlorine gas at 95° to 104°, and Snowden, in his letter, set the figure at 140°. Exhibit N.

The record is replete with evidence of the "inherent vice" of bleaching powder, and the law reports themselves show various instances of damage caused by bleaching powder. In Mainwaring v. Bark Carrie Delap (D. C.) 1 F. 874; Hamilton v. Bark Kate Irving (D. C.) 5 F. 630, and Union Castle Mail S. S. Co. v. Borderdale Shipping Co., [1919] 1 K. B. 612, the corrosive quality of this chemical was recognized. American bleaching powder has been especially difficult to carry, and the libelant was apprehensive about attempting to ship the very cargo in question. Moreover, there was no analysis of moisture content made, and moisture is a dominant cause of corrosion. The analysis sheet showed a chlorine test of about 40 per cent. in a number of the drums tested. This was too high, exceeded the 37 per cent. chlorine limit of the contract of sale, and caused the witness Gent to say that "I would not expect it to reach its destination safely."

Cockerill had rejected 40 or 50 drums before shipment at the plant of the manufacturer, because, when he tapped them with a stick, the powder would come out through little holes. This in itself tended to show that the lot of bleaching powder in question was unstable, and had probably even then begun to corrode the drums.

In view of the likelihood of corrosion in the event of excess chlorine and the general history of shipments of American bleaching powder, ample reason can be discovered for the damage to this cargo without attributing it to improper stowage. There is no doubt about the bad effects of moisture, and moist air would easily introduce itself through the joints of the drums which were not made airtight. Libelant's surveyor Metcalfe testified that during the season when the drums arrived "the Bombay atmosphere is heavily charged with moisture and the temperature high."

The bills of lading excepted "nature of goods," "change of character," "insufficiency of packages," "rust," and "heating." The Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035) excepts "inherent defect, quality or vice." If the stowage was proper, the damage would seem to come within the exceptions.

We think the stowage was proper, not only for the reasons already given, but because it was in any event done in accordance with the established custom and usage. The rule of the New York Board of Underwriters as to the stowage of bleaching powder is:

"Bleaching powder under deck, under supervision in tight drums in a compartment by itself."

Likewise in the "Memorandum Relating to Carriage of Dangerous Goods and Explosives in Ships," issued by the Board of Trade as late as 1926, the provision relating to carrying bleaching powder is:

"It must be packed in strong iron drums and stowed in a well-ventilated space away from all living quarters and not in the same compartment with turpentine, acids, foodstuffs, or merchandise liable to be damaged by gas."

[2] A formidable array of witnesses experienced in stowage approved the stowage in question, and even libelant's surveyor Metcalfe made no criticism of the places of stowage. In such circumstances, the usage of the trade, and not the opinion of chemists, however sound, is the test. Clark v. Barnwell, 12 How. at p. 282, 13 L. Ed. 985; Rich v. Lambert, 12 How. 347, 13 L. Ed. 1017; The Titania (D. C.) 19 F. 101; The Chasca (D. C.) 23 F. 156; The City of Alexandria (D. C.) 23 F. 826. The trade evidently thought that moisture, and not heat, was the danger. This was established by an overwhelming weight of evidence.

In spite of the mass of testimony of skilled men that the stowage was customary and proper, we are asked to declare it bad on

inferences at best uncertain as to the temperatures in the ship's compartments, and on conflicting views of the experts as to what degree of heat causes disintegration. This we decline to do.

[3] The steamship company seeks in its cross-libel to recover the cost of transshipment of the drums from Bombay to Calcutta and the expenses of discharging the cargo before the transshipment at Bombay.

The bill of lading provided at clause 3:

"Also that the shippers shall be liable for any loss or damage to steamer, cargo, lighter or wharf, caused by inflammable, explosive or dangerous goods, shipped without full disclosure of their nature, whether such shipper be principal or agent; and such goods may be thrown overboard or destroyed at any time without compensation. Extra charges, if any, for discharging, lighterage, or other expenses on hazardous goods, declared or considered as such by civil or military authorities must be borne by shippers and/or consignees."

It is argued on behalf of the steamship that the bleaching powder was *"shipped without full disclosure"* of its latent defects, and that, therefore, any expenses caused by it must be borne by W. R. Grace & Co. The nature of the cargo was certainly disclosed. Chief Officer Nakashima said that he knew it was bleaching powder, and the bills of lading stated that it was. Moreover, it was the third consignment of this chemical shipped by Grace on claimant's line. Bleaching powder was notoriously dangerous and perishable cargo, which the freight agent had waited a week or ten days before agreeing to accept. In such circumstances it is unreasonable to suppose that "full disclosure" meant a detailed description of all the attributes of the chemical and an account of everything that might develop in it.

But claimant maintains that the last sentence of clause 3, providing for payment by "shippers and/or consignees" of the expenses of discharging and lighterage of hazardous goods "declared or considered as such by civil or military authorities," is not limited to goods shipped without full disclosure. It seems difficult to read the last sentence without the limitation, for it was apparently added to cover certain expenditures in the event that they were not clearly embraced in the words "loss or damage" appearing at the beginning of the clause, and to subject the consignee as well as the shipper to payment of these "extra charges." But in any event the expenses of discharging and lighterage were not of goods declared or considered by civil or military authorities hazardous for any purpose. The provision cannot be thought to have in effect enabled the public authorities to determine generally whether shipper or carrier should pay for transshipment of cargo which the ship thought best to get off the vessel. It plainly only subjected "shippers and/or consignees" to expenses of discharging and lighterage, where the authorities should declare the goods hazardous and refuse to allow them to remain on the ship in port. Here the Bombay authorities merely declined to allow the goods to be landed at Bombay, which was not the port of destination. There is no evidence that they interfered with their remaining on the ship. Clause 3, therefore, in no aspect applied to the situation.

The libel, the intervening petition, and the cross-libel were properly dismissed, and the decree is affirmed.

MANTON, Circuit Judge (dissenting). There is sufficient in this record, sustaining the burden of the appellant, to establish liability on the part of the vessel for damage done to the bleaching powder. There were 1,079 drums stowed in the forward part of No. 3 between-decks against the engine room bulkhead and in No. 2 hold in the vicinity of the fire room bulkhead. To stow a cargo which was so easily subject to damage by excessive heat in these respective places was negligent. Those in authority were advised of the contents of the drums and knew the care that should have been exercised in selecting the place of stowage. Four hundred and eighty-one drums, stowed about one foot from the engine room bulkhead, were subject to the heat of the engine room, which, added to the heat created by the tropical sun beating down on the deck and sides of the ship, created a danger which resulted in damage. The balance was stowed in the after end of No. 2 lower deck, directly against the fire room bulkhead in the spare coal bunker. They were nearer to the fire room bulkhead than any other cargo in No. 2 hold. This is supported by the ship's stowage plan, protest to the master on October 29, 1920, and of the master and chief officer on November 12, 1920; survey protest of Ericson and Richard, September 17, 1920, and September 30, 1920; and the testimony of Roberts, surveyor at Bombay. Under the rules and practices as disclosed by the record—if, indeed, knowledge of the characteristics of the bleaching powder did not teach it—this cargo should not have been subjected to the danger of excessive heat of the engine room and steam pipes. It should have been placed in the coolest and most accessible part of the ship,

and the coolest part was No. 1 lower hold, where it appears that at no time during the voyage did the temperature reach 98.6° F., at and above which there was danger to the bleaching powder. If bleaching powder in drums is subjected to heat of 98.6° or higher for a number of days, it will give off fumes of chlorine gas and become damaged.

The court below found that the bleaching powder was carefully manufactured and properly packed in steel drums. Also that the drums and contents reached the ship in good order and condition, and that the owners of the ship had full knowledge of the nature of the goods, and that they took time to consider whether or not to accept the shipment. They finally accepted the shipment with full knowledge of what it was. Bleaching powder is a well-known commercial commodity and for many years has been successfully shipped in large quantities from the United States and Europe to tropical countries, including India, the destination of this cargo. It is established that previous shipments made on this shipowner's line were carried and arrived in good condition. There is testimony that stowage, as made of this cargo, where it was subject to excessive heat, was regarded by stevedores as bad stowage. There is an explanation of why these places of stowage were selected, and it may be found in the fact that the stevedore who stowed and supervised its stowage did not know that excessive heat would damage. But that does not excuse the shipowner. Thomas P. Beal (C. C. A.) 11 F.(2d) 49; Kaufer v. Luckenbach (D. C.) 294 F. 978; The Aki Maru (C. C. A.) 255 F. 721; San Guglielmo (D. C.) 241 F. 969; So. Pac. Co. v. Schuyler (C. C. A.) 135 F. 1015.

The cross-libel filed by the owners for the cost of transshipment of the drums from Bombay to Calcutta and the expense of discharging the cargo before transshipment at Bombay was properly dismissed.

The appellant Grace Bros. (India), Limited, should have a decree.