256

## CHEEK NEAL COFFEE CO. v. OSAKA SHOSEN KAISHA.

District Court, E. D. Louisiana. September 28, 1929.

No. 18726.

Deutsch & Kerrigan, Eberhart P. Deutsch, Dart & Dart, and H. Grady Price, all of New Orleans, La., for libelant.

Terriberry, Young, Rault & Carroll and H. F. Stiles, Jr., all of New Orleans, La., for respondent.

BORAH, District Judge. This is a libel in personam against Osaka Shosen Kaisha, a citizen of the Empire of Japan, for damage to certain shipments of coffee which were received on board the steamship Manila Maru for transportation from Santos, Brazil, to Galveston, Tex.; jurisdiction having been obtained by attachment of the steamship Havana Maru, a vessel owned and operated by respondent. The merchandise was shipped from Santos on September 29, 1926, under bills of lading which recited that it was "shipped in apparent good order and condition" and arrived at New Orleans, La., on October 25, 1926. The bills of lading contain the following clauses:

"2. * * * The ship and/or carrier shall not be liable for the consequences of quarantine. * * *

"3. In case of quarantine, the goods may be discharged into any depot or lazaretto, hulk or other vessel, as required for the ship's despatch; or should this be impractical, the Master may discharge the goods at a safe port of call, in his option, at the risk and expense of the shipper, consignee and/or owner of the goods; and the ship's and/or carrier's responsibility shall cease when the goods are so discharged. Quarantine expenses of whatever nature or kind to be borne by the shipper, consignee and/or owner of the goods."

Libelant alleges that the coffee was shipped in good order and condition and thereafter arrived at the port of New Orleans, where the steamship made delivery of the said coffee not, however, in the like good order and condition as when shipped, but seriously injured and damaged by water by reason of the fault and negligence of said steamship Manila Maru, her owner, master, officers, and crew with respect to the loading, stowage, custody, and care of the said cargo and by and through the defective and unseaworthy condition and deviation of the vessel.

Respondent admits that the coffee was delivered to it at Santos, Brazil, but denies that same was shipped in good order and condition. Further answering, respondent alleges that upon the arrival of the steamship Manila Maru at Lower Quarantine Station on October 24, 1926, it was discovered that there was a form of bubonic plague on board. A member of the ship's crew who had previously taken ill was isolated, and the passengers and 62 members of the crew were taken off the vessel and detained by the medical authorities for observation. On the following morning the Manila Maru proceeded up the river to New Orleans. Under the orders and directions of the United States Public Health Service, the crew were sent to the United States Marine Hospital and the vessel was placed under fumigation and denied the privilege of docking in the harbor until her entire cargo had been discharged and fumigated on lighters. Respondent further alleges that the manner in which the ship and the lighters should be fumigated was under the control and direction of the United States Public

Health authorities. That conditions existing in the harbor of New Orleans at the time of the arrival of the vessel precluded any possibility of obtaining a sufficient number of covered lighters to unladen the cargo; in consequence, a part of the cargo had to be discharged in open lighters, and it was while the coffee was in these open lighters under fumigation that there was rain which resulted in damage in spite of all reasonable precautions and endeavors on the part of the owner's representatives, the officers and members of the crew to prevent same. Respondent specifically pleads clauses 2, 3, and 22 of the bills of lading in defense of this action, and as a further defense pleads the Act of Congress of the United States of February 13, 1893, popularly known as the Harter Act (46 US CA §§ 190–195), and particularly sections 3 and 4 thereof.

▇ At this stage of the case it is important to determine whether or not the coffee was delivered to the carrier in good condition. The evidence discloses that the coffee was shipped under clean bills of lading, which recited that the shipment was in apparent good order and condition. Such a recital is not contractual and does not amount to a warranty as between the immediate parties and the carrier is free to prove the contrary. Hutchinson on Carriers (3d Ed.) § 157 et seq.; 10 C. J. 200. This the carrier has failed to do; in fact, two of its own witnesses have testified that they saw the coffee in the ship and it was dry and in good condition.

▇▇ Having concluded that the goods were shipped in good order and condition, and it being conceded that they were delivered in a damaged condition, it is incumbent on the respondent to show, since that is his defense, that the injury was occasioned by one of the perils from which he is exempted by the bills of lading. This the respondent has done by clearly establishing the fact that the damage falls within the exceptions against quarantine, consequently the burden is upon the shipper to prove the carrier's negligence as the affirmative lies upon it. This was held in Clark v. Barnwell, 12 How. 272, 280, 13 L. Ed. 985, 988, wherein the court said: " * * * After the damage to the goods, therefore, has been established, the burden lies upon the respondents to show, that it was occasioned by one of the perils from which they were exempted by the bill of lading, and, even where evidence has been thus given bringing the particular loss or damage within one of the dangers or accidents of the navigation, it is still competent for the shippers to show, that it might have been avoided by

the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods; for, then, it is not deemed to be, in the sense of the law, such a loss as will exempt the carrier from liability, but rather a loss occasioned by his negligence, and inattention to his duty. Hence it is, that, although the loss occurs by a peril of the sea, yet if it might have been avoided by skill and diligence at the time, the carrier is liable. But in this stage and posture of the case, the burden is upon the plaintiff to establish the negligence, as the affirmative lies upon him. * * * ''

▇ Applying this principle to the facts in the instant case, it is apparent that there is but one remaining issue, and that is: Has the shipper shown that the loss was occasioned by the negligence and inattention to duty of the carrier.

The libelant offered in evidence a stipulation between the parties which admitted its corporate existence, the issuance of the bills of lading and the ownership thereof in libelant, and the various bills of lading. It produced as its sole and only witness a cargo surveyor who was not present during the discharge, who knew nothing of the facts with reference thereto, and who testified merely as to the actual damage suffered by the cargo without endeavoring to fix the responsibility therefor.

As against this the master testified that at every port of call rat guards were put out and tar smeared on the gangway to prevent rats from coming on board; that the usual medical papers were obtained at every port; that there was no sickness on board until the vessel was one day's sailing out of south pass, and when this sickness was discovered he immediately communicated this fact by radio to the medical authorities at New Orleans. In testifying with reference to the orders and instructions he received from the United States Public Health Service, he stated that the government ordered the coffee discharged into lighters, and the crew and officers of the ship had nothing to do with the discharge of the cargo, as that was controlled by the government.

The third officer of the vessel corroborated the testimony of the master with reference to the precautions taken to prevent the ship from becoming infested with rats, and stated that the vessel was properly fumigated at Kobe, Japan, before proceeding on the voyage in question. He further testified that during the discharge unloading was stopped whenever rain commenced.

The assistant surgeon of the United States

Public Health Service said he was ordered on October 25, 1926, by his superior officer to fumigate the vessel and to prohibit her from docking until fumigation was completed; that the vessel was fumigated on five different occasions and the cargo was likewise fumigated on the lighters. He stated that the placing of the equipment and the method of procedure of this fumigation was left entirely to him, and that the stevedores who had been hired by the ship's agent, the Steele Steamship Lines, were instructed to place the tarpaulins in such a way as to hold gas. In his judgment in order to fumigate the vessel properly it was necessary to discharge the cargo into lighters.

The president of the Steele Steamship Lines testified that he received a radio message from the master of the Manila Maru advising him there were two cases of bubonic plague on board, and he immediately notified the medical officer in charge of the United States Public Health Service thereof; that the first instruction he received concerning the vessel was from Washington, and was to the effect that the ship must be held at Lower Quarantine Station and the entire cargo discharged at the mouth of the Mississippi river. He stated that he convinced the authorities that this was impractical, as there were no facilities for unlading cargo at the mouth of the river, and they finally permitted the vessel to proceed up the river and anchor in the stream in the harbor of New Orleans. This witness recited in detail the efforts on his part to secure permission from the medical authorities to permit discharge on a public wharf and, this failing, of his untiring efforts to secure covered lighters.

The chief fumigator testified that he, together with the assistant surgeon of the United State Public Health Service, directed how the tarpaulins should be placed on the lighters during fumigation and that he instructed the stevedores how they should be put on and laid. He further stated that the lighters he saw were absolutely dry before the coffee was put into them.

The manager of the stevedoring company testified as to the diligent efforts on his part to secure covered lighters. He described the lighters he was able to obtain, and stated that they were all dry and in good condition when they came alongside to receive cargo. He stated that the representatives of the United States Public Health Service directed the exact placing of the tarpaulins, though they were actually placed by the men under his supervision, and that rainwater got into the lighters because of the method that the government insisted on using in placing the tarpaulins for fumigation purposes. The witness testified that had he been permitted to exercise his own judgment he would have placed the tarpaulins flush with the sides of the lighters so that the rainwater would have run in the river instead of into the lighters; but he was instructed and told what to do and was even prohibited from placing additional tarpaulins over the coffee and hanging same over the edges of the lighters. He further stated that they had a sufficient number of tarpaulins and that they were in good condition.

Considering this testimony and all the other surrounding facts and circumstances of the case, I am persuaded that the United States Public Health Service was in complete control of the situation, and that their representatives dictated the method of procedure and the manner in which the ship and lighters should be fumigated. I am also satisfied that there was no negligence or inattention to duty on the part of the carrier.

A decree may be entered in favor of respondent dismissing the libel with costs.